1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

                            ----oo0oo----

11

12   REVERGE ANSELMO and SEVEN HILLS      CIV. NO. 2:12-01422 WBS EFB
     LAND AND CATTLE COMPANY, LLC,
13                                        MEMORANDUM & ORDER RE: MOTIONS
               Plaintiffs,                FOR SUMMARY JUDGMENT
14
          v.
15
     RUSS MULL, LESLIE MORGAN,
16   Shasta County Assessor-
     Recorder, COUNTY OF SHASTA,
17   BOARD OF SUPERVISORS OF THE
     COUNTY OF SHASTA, LES BAUGH,
18   and GLENN HAWES,

19             Defendants.

20

21

22                          ----oo0oo----

23          Plaintiffs Reverge Anselmo and Seven Hills Land and

24   Cattle Company, LLC brought this action against defendants County

25   of Shasta, California ("the County"), the Board of Supervisors of

26   Shasta County ("the Board"), Leslie Morgan, Russ Mull, Les Baugh,

27   and Glenn Hawes arising out of a series of land use disputes

28   beginning in 2007.  Plaintiffs seek damages and injunctive relief

                                   1

1   under 42 U.S.C. § 1983, as well as a writ of mandate compelling

2   defendants to award plaintiffs a land conservation contract

3   pursuant to the California Land Conservation Act of 1965 ("the

4   Williamson Act"), Cal. Gov't Code § 51200 et seq.  The parties

5   both move for summary judgment pursuant to Federal Rule of Civil

6   Procedure 56.

7   I.   Factual & Procedural History

8         Plaintiffs own and operate two properties in Shasta

9   County that are at issue in this action.  Since at least 2006,

10  plaintiffs have owned and operated Home Ranch, a 1200-acre

11  property located in the Inwood Valley.  (See Anselmo Decl. ¶ 27

12  (Docket No. 139-5).)  In 2007, plaintiffs purchased Bear Creek

13  Ranch, a 670-acre property located three miles away from Home

14  Ranch, which they planned to utilize for raising cattle.  (Id. ¶

15  2.)

16        After purchasing Bear Creek Ranch, plaintiffs began

17  clearing the property of weeds, vines, bushes, and dead or dying

18  trees in order to replant the pasture areas of the property.

19  (Id. ¶¶ 2-3.)  California Regional Water Quality Control Board

20  employee Andrew Jensen received a report in October 2007 of

21  potential violations of state and federal water quality laws at

22  Bear Creek Ranch.  (Decl. of Andrew Jensen in Supp. of Mot. for

23  Summ. J. ("Jensen Decl.") ¶ 3 (Docket No. 133-1).)  Jensen

24  initiated an investigation of the alleged violations and visited

25  Bear Creek Ranch several times.  (Id.)  On October 15, 2007,

26  Jensen directed Garrett Glauzer, a construction foreman at Bear

27  Creek Ranch, to cease operations.  (Id. Ex. 2.)  Jensen

28  reiterated this direction to Anselmo the next day, (id.), and

2

1  prepared a report documenting his findings and a Cleanup and

2  Abatement Order, which he issued to the County.  (Jensen Decl. ¶¶

3  3, 6.)

4         On October 30, 2007, plaintiffs received a letter from

5  James Smith, an Environmental Health Division Manager with the

6  County, stating that plaintiffs had violated the County's grading

7  ordinance by engaging in grading activities without a valid

8  grading permit.  (Pls.' Mem. Ex. B. (Docket No. 134-9).)  Paul

9  Minasian, an attorney for plaintiffs, sent Smith a letter on

10 November 12, 2007, disputing the finding of a grading violation

11 and contending that plaintiffs' activities were exempt under the

12 County's grading ordinance.  (Id. Ex. C.)  Smith responded in a

13 letter dated December 20, 2007, that the alleged grading

14 activities were not exempt because they had occurred in and

15 adjacent to a drainage way.  (Id. Ex. D.)  Minasian sent Smith a

16 response on January 2, 2008, in which he reiterated plaintiffs'

17 position that they had not violated the grading ordinance.  (Id.

18 Ex. E.)

19        In December 2007, Anselmo invited Glenn Hawes, a member

20 of the Board, to Bear Creek Ranch to discuss the grading

21 violation.  (Anselmo Decl. ¶ 16.)  Anselmo testified that Hawes

22 saw the work that was being done on the property and stated that

23 "he did not understand how it could be claimed that this was

24 grading that required a permit."  (Id.)  Anselmo avers that Hawes

25 advised him to buy mitigation credits and offer them to the

26 County "in order to end the harassment" and that Hawes

27 "explicitly mentioned his Stillwater Plains Mitigation Bank as a

28 potential candidate for those mitigation credits."  (Id.)

1   Anselmo refused this offer.  (Id. ¶ 16.1.)  Although defendants

2   contest plaintiffs' narration of these events, they concede that

3   this meeting occurred, (see Hawes Decl. ¶¶ 7-10 (Docket No.

4   135)), and that Hawes stated that Anselmo "might be able to

5   resolve the violations" by purchasing a conservation easement for

6   the Home Ranch property.  (Id. ¶ 8; Defs.' Statement of

7   Undisputed Facts ("Defs.' SUF") ¶ 47 (Docket No. 133-32).)

8           Anselmo then requested an additional meeting with

9   Hawes, Supervisor Les Baugh, Russ Mull, the Director of the

10  County's Resource Management Department, and Larry Lees, the

11  County Administrative officer.  (Anselmo Decl. ¶ 17.)  This

12  meeting took place on February 1, 2008, and was also attended by

13  Willy Preston, the legislative aide for then-Assemblyman Doug

14  LaMalfa.  (Id.)  Anselmo avers that at this meeting, Mull

15  threatened to obstruct his application for a permit to operate a

16  winery at the Home Ranch property if he did not obtain a grading

17  permit.  (Anselmo Dep. at 181:12-16.)  Although Mull claims that

18  he "did not tell Mr. Anselmo that I would hold up his certificate

19  of occupancy at the Winery Property," he admits that he "told him

20  that . . . a landowner may be denied future discretionary permits

21  if there are outstanding violations on the property."  (Decl. of

22  Russ Mull ("Mull Decl.") ¶ 9 (Docket No. 135-2).)

23          After this meeting, Anselmo called Baugh and asked if

24  there was any other way to cure the grading violation.  (Anselmo

25  Decl. ¶ 23; Baugh Decl. ¶ 11 (Docket No. 135-1).)  Baugh then

26  contacted Mull and asked what could be done to resolve the

27  grading violation.  (Id.; Mull Decl. ¶ 10.)  Mull responded that

28  if plaintiffs obtained a hydroelectric permit for the Bear Creek

4

1   Ranch property, it could encompass the grading violation.  (Id.)

2   Baugh relayed this message to Anselmo, (Baugh Decl. ¶ 12), who

3   interpreted it as a request for a "face-saving measure."

4   (Anselmo Decl. ¶ 24.)

5          In the meantime, Bridget Dirks, an Associate Planner

6   with the County, sent plaintiffs a letter on January 30, 2008,

7   stating that plaintiffs would need to conduct a "botanical

8   survey" on the Home Ranch property to determine whether a plant

9   known as Ahart's Paronychia was present.  (Defs.' Request for

10  Judicial Notice ("Defs.' RJN") Ex. 25 at 35 (Docket No. 133-29).)

11  Anselmo avers that he had the Home Ranch property examined by Tom

12  Benson, a botanist and Natural Resources Conservation Service

13  engineer.  (Anselmo Dep. at 206:20-25.)  Anselmo avers that

14  Benson wrote a letter to the County's resources management

15  division indicating that plaintiffs' property did not contain

16  hydric soils that could serve as a habitat for Ahart's

17  Paronychia.  (Id.)  Dirks nonetheless required plaintiffs to

18  conduct the plant study, which plaintiffs contend delayed the

19  approval of their application for a permit for the proposed

20  winery project by several months and cost an additional $5,000.

21  (Id. at 207:2-14; Anselmo Decl. ¶ 26.)

22         On September 3, 2008, plaintiffs received a letter from

23  Lio Salazar, an Associate Planner with the County, stating that

24  their application for a land conservation contract for the Bear

25  Creek Ranch property ("Williamson Act contract") could not move

26  forward until the grading violations were remedied.[1]  (Pls.' Mem.

27  _____

28         [1]    The Williamson Act authorizes cities and counties in
    California to offer a land conservation contract to owners of

1   Ex. H.)  Salazar reiterated this position in a letter sent on

2   October 8, 2008.  (Id. Ex. J.)

3         Plaintiffs sent a letter to the Board, Mull, and

4   Michael Ralston, the Shasta County Counsel, on October 14, 2008.

5   (Id. Ex. L.)  In this letter, plaintiffs contested the finding of

6   a grading violation, argued that the County failed to serve a

7   Notice of Non-Compliance with the grading violation, claimed that

8   they had been denied an opportunity to appeal the grading

9   violation, and threatened further legal action if the Williamson

10   Act contract was not approved.[2]  (Id.)  Following this letter,

11   the County Planning Commission unanimously recommended that the

12   Board conduct a public hearing and grant plaintiffs' application

13   for a Williamson Act contract.  (Id. Exs. 2-3.)

14         On December 16, 2008, the Board held a meeting at which

15   plaintiffs' application for a Williamson Act was placed on the

16   agenda.  (See Minutes, Shasta Cnty Bd. of Supervisors, Dec. 16,

17   2008 ("Dec. 16 Minutes") (Defs.' RJN Ex. 7) (Docket No. 133-35).)

18   Before the Board considered the contract, it considered the more

19

20   agricultural land meeting certain statutory requirements.  Cal.
Gov't Code § 51240.  In exchange for agreeing to maintain their

21   property as full-time agricultural land, the owner of land
subject to a Williamson Act contract receives favorable tax

22   treatment on that land.  Cal. Rev. & Tax. Code § 423.3.  The
State of California provides subvention payments to cities and

23   counties who enter into Williamson Act contracts in order to
offset the lost tax revenue.  Cal. Gov't Code § 16142.

24

25       [2]  Shortly before mailing this letter, plaintiffs filed
the precursor to this lawsuit in Shasta County Superior Court on

26   October 2, 2008.  (Defs.' RJN Ex. 24.)  Plaintiffs named the
County, Jensen, and Mull as defendants and also sued Hawes &

27   Baugh as Doe defendants.  Id.  Plaintiffs and Jensen agreed to a
stipulated dismissal of the state court action in June 2009.

28   (Docket No. 139-3.)

1  general question of whether the County should place a moratorium

2  on all new Williamson Act contracts in light of the possibility

3  that the State of California would discontinue subvention

4  payments.  (Id. at 8.)  County staff estimated that the County

5  could lose as much as $125,000 per year if these payments ceased.

6  (Id.)  Although the Board put this issue up for a vote, it failed

7  by a 4-1 margin.  (Id.)  Only Supervisor David Kehoe voted in

8  favor of the motion.  (Id.)

9        The Board then considered plaintiffs' application for a

10 Williamson Act contract.  (Id. at 9-10.)  Hawes and Baugh recused

11 themselves from this vote.  (Id. at 9.)  While Hawes and Baugh

12 contend that they recused themselves because they had been named

13 as defendants in a suit brought by plaintiffs, (see Hawes Decl. ¶

14 12; Baugh Decl. ¶ 15), plaintiffs argue that this "was a bad

15 faith pretext to bring about what they believed would constitute

16 a denial of Plaintiffs' application."  (Third Am. Compl. ("TAC")

17 ¶ 55.0 (Docket No. 1-2).)  The remaining three Supervisors then

18 considered plaintiffs' application for a Williamson Act contract.

19 (Dec. 16 Minutes at 10.)  Supervisors Cibula and Hartman voted in

20 favor of awarding the contract, while Kehoe voted against it and

21 reiterated his earlier concerns about discontinued subvention

22 payments.  (Id.)  As a result, plaintiffs did not receive a

23 Williamson Act contract for Bear Creek Ranch.  (Id.)

24       Plaintiffs amended their Complaint in February, May,

25 and August 2009 to name Baugh, Hawes, the Board, and Leslie

26 Morgan, the County Assessor-Recorder as defendants and to add

27 allegations arising out of the Board's decision to deny

28 plaintiffs a Williamson Act contract.  (See TAC 1.)  On May 11,

1  2012, defendants filed a cross-complaint against plaintiffs for

2  violation of the Unfair Competition Law, Cal. Bus. & Prof. Code §

3  17200 et seq. and public nuisance, as well as third-party claims

4  against Jensen, Nancy Haley, Matthew Rabbe, and Matthew Kelley

5  for contribution and indemnity.  (Docket No. 1-1.)  The United

6  States then removed the action to this court pursuant to 28

7  U.S.C. § 1346(b) on the basis that Haley, Rabbe, and Kelley were

8  federal employees sued for torts arising out of the scope of

9  their employment.  (Docket No. 1.)

10        The court dismissed defendants' third-party claims

11  against Haley, Rabbe, and Kelley on September 21, 2012, (Docket

12  No. 58), and dismissed defendants' third-party claims against

13  Jensen on October 11, 2012.  (Docket No. 91.)  Defendants then

14  filed separate counterclaims against plaintiffs on December 5,

15  2012 for public nuisance and violation of the Unfair Competition

16  Law.  (Docket No. 102.)  On March 18, 2013, the court remanded

17  defendants' counterclaims to Shasta County Superior Court and

18  retained jurisdiction over only plaintiffs' § 1983 and writ of

19  mandate claims.  (Docket No. 117.)  On September 6, 2013, both

20  parties filed motions for summary judgment on those two claims.

21  (Docket Nos. 133-134.)

22  II.  Legal Standard

23        Summary judgment is proper "if the movant shows that

24  there is no genuine dispute as to any material fact and the

25  movant is entitled to judgment as a matter of law."  Fed. R. Civ.

26  P. 56(a).  A material fact is one that could affect the outcome

27  of the suit, and a genuine issue is one that could permit a

28  reasonable jury to enter a verdict in the non-moving party's

1   favor.  _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 248

2   (1986).  The party moving for summary judgment bears the initial

3   burden of establishing the absence of a genuine issue of material

4   fact and can satisfy this burden by presenting evidence that

5   negates an essential element of the non-moving party's case.

6   _Celotex Corp. v. Catrett_, 477 U.S. 317, 322–23 (1986).

7   Alternatively, the moving party can demonstrate that the non-

8   moving party cannot produce evidence to support an essential

9   element upon which it will bear the burden of proof at trial.

10  _Id._

11       Once the moving party meets its initial burden, the

12  burden shifts to the non-moving party to "designate 'specific

13  facts showing that there is a genuine issue for trial.'"  _Id._ at

14  324 (quoting then-Fed. R. Civ. P. 56(e)).  To carry this burden,

15  the non-moving party must "do more than simply show that there is

16  some metaphysical doubt as to the material facts."  _Matsushita_

17  _Elec. Indus. Co. v. Zenith Radio Corp._, 475 U.S. 574, 586 (1986).

18  "The mere existence of a scintilla of evidence . . . will be

19  insufficient; there must be evidence on which the jury could

20  reasonably find for the [non-moving party]."  _Anderson_, 477 U.S.

21  at 252.

22       In deciding a summary judgment motion, the court must

23  view the evidence in the light most favorable to the non-moving

24  party and draw all justifiable inferences in its favor.  _Id._ at

25  255.  "Credibility determinations, the weighing of the evidence,

26  and the drawing of legitimate inferences from the facts are jury

27  functions, not those of a judge . . . ruling on a motion for

28  summary judgment . . . ."  _Id._

1  III. <u>Evidentiary Objections</u>

2          On a motion for summary judgment, "[a] party may object

3  that the material cited to support or dispute a fact cannot be

4  presented in a form that would be admissible in evidence."  Fed.

5  R. Civ. P. 56(c)(2).  "[T]o survive summary judgment, a party

6  does not necessarily have to produce evidence in a form that

7  would be admissible at trial, as long as the party satisfies the

8  requirements of Federal Rules of Civil Procedure 56."  <u>Fraser v.

9  Goodale</u>, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (quoting <u>Block v.

10  City of Los Angeles</u>, 253 F.3d 410, 418–19 (9th Cir. 2001))

11  (internal quotation marks omitted).  Even if the non-moving

12  party's evidence is presented in a form that is currently

13  inadmissible, such evidence may be evaluated on a motion for

14  summary judgment so long as the moving party's objections could

15  be cured at trial.  <u>See Burch v. Regents of the Univ. of Cal.</u>,

16  433 F. Supp. 2d 1110, 1119–20 (E.D. Cal. 2006) (Shubb, J.).

17          Defendants raise dozens of objections to the evidence

18  offered alongside plaintiffs' Motion for Summary Judgment,

19  (Docket No. 138-1), and the evidence offered alongside

20  plaintiffs' Opposition. (Docket No. 141-1).)  Defendants'

21  objections based on compound phrasing are inappropriate because

22  the evidence could be presented in an admissible form at trial,

23  <u>see Burch</u>, 433 F. Supp. 2d. at 1119-20, and the court will

24  overrule them.  The court does not rely on any of the evidence

25  that defendants characterize as hearsay, and the court will

26  therefore overrule these objections as moot.

27          Defendants' objections to evidence on the basis of lack

28  of foundation, speculation, or relevance are all duplicative of

1   the summary judgment standard itself.  <u>See</u> <u>id.</u>  A court can award

2   summary judgment only when there is no genuine dispute of

3   material fact.  Statements based on improper legal conclusions or

4   without personal knowledge are not facts and can only be

5   considered as arguments, not as facts, on a motion for summary

6   judgment.  Instead of challenging the admissibility of this

7   evidence, lawyers should challenge its sufficiency.  Objections

8   on any of these grounds are superfluous, and the court will

9   overrule them.

10          Defendants specifically object to paragraph 11 of

11   Anselmo's declaration, as well as plaintiffs' Exhibit C,

12   consisting of a letter sent by Paul Minasian on November 12,

13   2007, on the basis that this evidence violates the "sham

14   affidavit" rule.  (Defs.' Objections to Pls.' Evidence in Opp'n ¶

15   3.)  Defendants argue that Anselmo's characterization of this

16   letter as an "appeal" of the grading violation is a sham because

17   it contradicts his earlier deposition testimony that this letter

18   was not intended as an appeal of the County's grading violation.

19   (<u>Id.</u>)

20          The sham affidavit rule prohibits a party from creating

21   a factual dispute by an affidavit contradicting his prior

22   deposition testimony.  <u>Nelson v. City of Davis</u>, 571 F.3d 924,

23   927-28 (9th Cir. 2009).  The sham affidavit rule does not "cover

24   all instances when evidence conflicts with the party's

25   testimony."  <u>Id.</u> at 929.  Nor does it prohibit a party "from

26   elaborating upon, clarifying, or explaining prior testimony

27   elicited by opposing counsel on deposition; minor inconsistencies

28   that result from an honest discrepancy, a mistake, or newly

1   discovered evidence afford no basis for excluding an opposition
2   affidavit."  <u>Messick v. Horizon Indus.</u>, 62 F.3d 1227, 1231 (9th
3   Cir. 1995).

4         Defendants are correct that Anselmo's affidavit is
5   inconsistent with his prior deposition testimony that the letters
6   sent by Minasian on November 12, 2007, and January 2, 2008, were
7   "not the written appeals . . . sent on [Anselmo's] behalf."
8   (Anselmo Dep. at 152:21-23.)  However, Paragraph 11 of Anselmo's
9   affidavit accurately states that Minasian sent defendants a
10  letter on November 12, 2007, and that this letter expressed
11  plaintiffs' position that their conduct did not require a grading
12  permit.  (Anselmo Decl. ¶ 11.)

13        As this Order makes clear, whether or not Minasian's
14  letters constituted a formal appeal of the grading violation is
15  immaterial; what is important is that those letters were received
16  by defendants and that they disputed the County's finding of a
17  grading violation.  For this reason--and out of an abundance of
18  caution--the court will sustain defendants' objection as to the
19  words "appealing the determination . . . and" on line 3 of
20  paragraph 11 and will overrule the objection as to the remainder
21  of Anselmo's affidavit and Minasian's letter itself.

22  IV.  <u>Discussion</u>

23        A.   <u>Claims Brought Under 42 U.S.C. § 1983</u>

24             In relevant part, § 1983 provides:

25        Every  person  who,  under  color  of  any  statute,
          ordinance, regulation, custom, or usage, of any State
26        . . . , subjects, or causes to be subjected, any
          citizen  of  the  United  States . . . to the deprivation
27        of  any  rights,  privileges,  or  immunities secured by
          the  Constitution  and  laws,  shall  be  liable to the
28        party injured in an action at law, suit in equity or

other proper proceeding for redress . . . .

42 U.S.C. § 1983.  While § 1983 is not itself a source of substantive rights, it provides a cause of action against any person who, under color of state law, deprives an individual of federal constitutional rights or limited federal statutory rights.  Id.; Graham v. Connor, 490 U.S. 386, 393-94 (1989).

Plaintiffs bring four claims against all defendants under § 1983 for: (1) deprivation of their property without just compensation in violation of the Fifth Amendment; (2) violation of the Fourteenth Amendment Equal Protection Clause; (3) deprivation of procedural and substantive due process in violation of the Fourteenth Amendment; and (4) retaliation for conduct protected by the First Amendment.  (TAC ¶ 60.0.) Plaintiffs seek damages, injunctive relief, and a writ of mandate to compel the award of a contract pursuant to the Williamson Act. (Id.)  Defendants seek summary judgment on each of these claims.

1.   Takings Clause

The Fifth Amendment prohibits the taking of private property for public use without just compensation.  U.S. Const. amend. V.  However, "if a state provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation."  Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 195 (1985).  California allows landowners to pursue inverse condemnation remedies in state court.  See Cal. Const. Art. I. § 19; San Diego Gas & Elec. Co. v. Superior Court, 13 Cal. 4th 893

13

1   (1996).  Consequently, a plaintiff alleging a taking of his

2   property without just compensation generally must pursue his

3   claim through state inverse condemnation proceedings before

4   bringing his claim in federal court.  See, e.g., Williamson

5   Cnty., 473 U.S. at 196-97; Guggenheim v. City of Goleta, 638 F.3d

6   1111, 1117 (9th Cir. 2010).

7           Plaintiffs offer no evidence that they pursued state

8   inverse condemnation remedies prior to bringing this action.

9   Rather, plaintiffs assert that they are not required to bring an

10  inverse condemnation action "as a condition of enforcing their

11  rights to procedural due process and equal protection." (Pls.'

12  Opp'n at 31 (Docket No. 139).)  Even so, plaintiffs do not

13  dispute that they must resort to state inverse condemnation

14  remedies prior to bringing a § 1983 claim premised on an

15  unconstitutional taking of their property.  Accordingly, insofar

16  as plaintiffs' § 1983 claim is premised on a violation of the

17  Takings Clause, the court must grant defendants' motion for

18  summary judgment.

19              2.   Equal Protection Clause

20          Plaintiffs argue that defendants violated their rights

21  under the Equal Protection Clause by refusing to grant plaintiffs

22  a Williamson Act contract, even though defendants granted

23  contracts to similarly situated landowners.  (Pls.' Mem. at 9-

24  15).  The Equal Protection Clause guarantees that "[n]o state

25  shall . . . deny to any person within its jurisdiction the equal

26  protection of the laws."  U.S. Const. amend. XIV, § 1.  The

27  Supreme Court has recognized equal protection claims based the

28  theory that the plaintiff "has been irrationally singled out as a

1  so-called 'class of one.'"  Engquist v. Or. Dep't of Agric., 553

2  U.S. 591, 601 (2008) (citing Village of Willowbrook v. Olech, 528

3  U.S. 562, 564 (2000) (per curiam)).

4       In order to succeed on their "class of one" claim,

5  plaintiffs must show that defendants: "(1) intentionally (2)

6  treated [plaintiffs] differently than other similarly situated

7  property owners, (3) without a rational basis."  Gerhart v. Lake

8  County, 637 F.3d 1013, 1022 (9th Cir. 2011) (citing Olech, 528

9  U.S. at 564).  For purposes of a "class of one" claim, a

10  defendant's conduct "comports with equal protection if there is

11  any reasonably conceivable state of facts that could provide a

12  rational basis for the classification."  SeaRiver Mar. Fin.

13  Holdings v. Mineta, 309 F.3d 662, 679 (9th Cir. 2002) (citations

14  and internal quotation marks omitted); accord Vance v. Bradley,

15  440 U.S. 93, 111 (1979) (holding that rational basis scrutiny

16  requires a plaintiff to show that the "facts on which the

17  classification is apparently based could not reasonably be

18  conceived to be true by the governmental decisionmaker").

19       Defendants have demonstrated a rational basis for the

20  Board's decision to deny it a Williamson Act contract.  Rule 9(a)

21  of the County's Administrative Manual provides that "[a]n

22  affirmative vote of three members is necessary for the Board to

23  take action" on any item placed on the Board's agenda.  (Admin.

24  Policy 1-101 (Defs.' RJN Ex. 5) (Docket No. 133-34).)  Rule 9(b)

25  of the Administrative Manual states that a Supervisor may abstain

26  from voting based on an actual or perceived conflict of interest

27  and that, if he does so, the abstention "shall count as a non-

28  vote."  (Id.)  Neither party disputes that Hawes and Baugh

15

1  recused themselves from voting on whether to approve plaintiffs'

2  application for a Williamson Act contract at the Board's meeting

3  on December 16, 2008.  (Dec. 16 Minutes at 9.)  As a result, the

4  Board could only approve the Williamson Act contract if the

5  remaining three supervisors voted unanimously to do so.[3]

6       Plaintiffs' application for a Williamson Act contract

7  failed to receive each of those three votes.  (Id. at 10.)  It is

8  undisputed that Supervisor David Kehoe voted "no" and that he

9  announced that he would prefer not to accept any new Williamson

10  Act contracts because it was unclear whether the State of

11  California would end subvention payments to local agencies for

12  lands covered by a Williamson Act contract.  (Id.)  This

13  rationale was consistent with his efforts earlier in the meeting

14

---

15       [3]  Plaintiffs argue that California law requires the
   abstentions of Hawes and Baugh to be treated as affirmative votes
16  in favor of approving the Williamson Act contract, rather than as
   non-votes.  (Pls.' Mem. at 27-28.)  Although plaintiffs are
17  correct that some decisions have presumed that an abstention is
   treated as an affirmative vote, the Board has adopted rules that
18  require three affirmative votes and treat an abstention as a
   "non-vote."  (See Admin. Policy 1-101 (Defs.' RJN Ex. 5).)  These
19  provisions "alter[ed] the ordinary common law rule" by requiring
   an affirmative vote of three Supervisors, rather than a simple
20  majority of those voting, in order to approve an agenda item.
   County of Sonoma v. Superior Court, 173 Cal. App. 4th 322, 346
21  n.11 (1st Dist. 2009).
        Plaintiffs' reliance on Dry Creek Valley Ass'n v. Bd.
22  Of Supervisors, 67 Cal. App. 3d 839 (1st Dist. 1977), is
   misplaced.  There, the Board of Supervisors had adopted a rule
23  stating that, in the event that one less than the necessary
   number of affirmative votes had been cast, an abstention could be
24  counted as a concurrence.  Id. at 841.  Here, the Board has
   adopted no such rule; rather, Rule 9(a) specifically requires
25  three affirmative votes in order to take action and Rule 9(b)
   provides that an abstention "shall count as a non-vote."  (See
26  Admin. Policy 1-101 (Defs.' RJN Ex. 5).)

27

28

1   to place a moratorium on all new Williamson Act contracts because

2   of the possibility that subvention payments would be

3   discontinued.  (Id. at 8.)  Indeed, Richard Simon, the current

4   County Director of Resource Management, avers that the State has

5   reduced subvention payments to "virtually zero," and the County

6   has not approved any new Williamson Act contract since December

7   16, 2008. (Simon Decl. ¶ 13 (Docket No. 133-15).)

8          Plaintiffs do not dispute that the State of California

9   had announced that it was considering ending subvention payments.

10   (Pls.' Resp. to Defs.' SUF ¶ 88.)  Nor do they dispute that

11   County staff had briefed the board about the status of subvention

12   payments and advised the Board that the County could lose as much

13   as $125,000 per year if the state eliminated these payments.

14   (Id. ¶ 89.)  Plaintiffs have therefore not "rebut[ted] the facts

15   underlying defendants' asserted rationale . . . to show that the

16   challenged classification could not reasonably be viewed to

17   further the asserted purpose."  Lazy Y Ranch, Ltd. v. Behrens,

18   546 F.3d 580, 590-91 (9th Cir. 2008).

19          To the extent that the Board singled out plaintiffs for

20   disparate treatment at all, the evidence shows that Kehoe, whose

21   vote was decisive, failed to approve the application for a

22   Williamson Act contract because of its potential fiscal

23   consequences. (See Dec. 16 Minutes at 8, 10.)  The court need not

24   determine whether this concern actually motivated Kehoe or the

25   Board so long as the evidence demonstrates that there was at

26   least a "theoretical connection" between this stated reason for

27   denying the contract and the Board's ultimate decision.

28   Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 463 (1981).

1   Accordingly, to the extent that plaintiffs' § 1983 claim is

2   premised on a violation of the Equal Protection Clause, the court

3   must grant defendants' motion for summary judgment.

4           3.   Due Process Clause

5           The Fourteenth Amendment provides that no state shall

6   deprive any person of life, liberty, or property without due

7   process of law.  U.S. Const. amend. XIV, § 1.  In order to bring

8   a procedural or substantive due process claim, a plaintiff must

9   make a threshold "showing of a liberty or property interest

10  protected by the Constitution."  Wedges/Ledges of Cal., Inc. v.

11  City of Phoenix, 24 F.3d 56, 62 (9th Cir. 1994) (citing Bd. of

12  Regents v. Roth, 408 U.S. 564, 577 (1972)).

13          "Property interests are not created by the Constitution

14  but 'by existing rules or understandings that stem from an

15  independent source such as state law . . . .'"  Thornton v. City

16  of St. Helens, 425 F.3d 1158, 1164 (9th Cir. 2005) (quoting Roth,

17  408 U.S. at 577).  "In some instances, a person can have a

18  constitutionally protected property interest in a government

19  benefit, such as a license or permit."  Gerhart, 637 F.3d at 1019

20  (citing Roth, 408 U.S. at 577).  But a plaintiff who asserts a

21  property interest in a permit or other government benefit cannot

22  simply demonstrate that he had a "unilateral expectation" or an

23  "abstract need or desire" for that benefit; rather, he must

24  demonstrate "a legitimate claim of entitlement to it."  Roth, 408

25  U.S. at 577 (emphasis in original).

26          Whether plaintiffs have an "expectation of entitlement

27  sufficient to create a property interest . . . depend[s] largely

28  upon the extent to which the statute contains mandatory language

18

1    that restricts the discretion of the decisionmaker." <u>Allen v.</u>

2    <u>City of Beverly Hills</u>, 911 F.2d 367, 370 (9th Cir. 1990) (quoting

3    <u>Jacobson v. Hannifin</u>, 627 F.2d 177, 180 (9th Cir. 1980)).  "[A]n

4    entitlement to a government permit exists when a state law or

5    regulation requires that the permit be issued once certain

6    requirements are satisfied." <u>Gerhart</u>, 637 F.3d at 1019 (citing

7    <u>Groten v. California</u>, 251 F.3d 844, 850 (9th Cir. 2001)).  By

8    contrast, if the decision to grant a permit or other benefit is

9    discretionary, plaintiffs have no property interest in that

10   benefit.  <u>Doyle v. City of Medford</u>, 606 F.3d 667, 672 (9th Cir.

11   2010) (citing <u>Jacobson</u>, 627 F.3d at 180).

12        Plaintiffs have no property interest in a conditional

13   use permit for a winery at the Home Ranch property.  California

14   law provides that "[t]he decision whether to issue a conditional

15   use permit is 'discretionary by definition.'" <u>Kay v. City of</u>

16   <u>Rancho Palos Verdes</u>, 504 F.3d 803, 810 (9th Cir. 2007) (quoting

17   <u>Breakzone Billiards v. City of Torrance</u>, 81 Cal. App. 4th 1205,

18   1224 (2d Dist. 2000)).  Plaintiffs' winery permit is therefore

19   "no[t] a federally protected property interest on which to base a

20   . . . due process claim." <u>Clark v. City of Hermosa Beach</u>, 48

21   Cal. App. 4th 1152, 1183 (2d Dist. 1996).

22        Plaintiffs also have no property interest in a

23   Williamson Act contract.  The Williamson Act states that "[a]ny

24   city or county may by contract limit the use of agricultural

25   land."  Cal. Gov't Code § 51240.  A city or county must offer a

26   Williamson Act contract to land located within a designated

27   "agricultural preserve" and cannot offer a contract if the land

28   is not so designated.  Cal. Gov't Code §§ 51241-51242.  Although

                                19

1   these provisions are not discretionary, the Williamson Act

2   nonetheless commits ultimate discretion to cities and counties by

3   providing that "any city or county . . . may establish an

4   agricultural preserve."  Cal. Gov't Code § 51230 (emphasis

5   added).

6          Although plaintiffs concede that the Bear Creek Ranch

7   property is not located within an agricultural preserve, they

8   contend that defendants lacked discretion not to designate the

9   property as an agricultural preserve.  (Pls.' Opp'n 13-14.)  This

10  argument is inconsistent with the statutory text, as the

11  Williamson Act's use of "[t]he word 'may' . . . implies some

12  degree of discretion."  United States v. Rodgers, 461 U.S. 677,

13  706 (1983).  It is also inconsistent with longstanding precedent

14  that emphasizes the Williamson Act's "discretionary language" and

15  characterizes it as "permissive, not mandatory, legislation."

16  Kelsey v. Colwell, 30 Cal. App. 3d 590, 595 (5th Dist. 1973); see

17  also Sierra Club v. City of Hayward, 28 Cal. 3d 840, 851 (1981)

18  (noting that the Williamson Act "empowers local governments to

19  establish 'agricultural preserves'" and that a "locality may

20  offer to owners . . . the opportunity to enter into . . .

21  contracts that restrict the land to open space").

22          Plaintiffs contend that even if the Williamson Act

23  itself does not entitle them to a contract, they are nonetheless

24  entitled to one pursuant to the terms of the County's General

25  Plan.  (Pls.' Opp'n 13-14.)  Section 6.1.4, AG-f of the General

26  Plan states that "[a]ll lands classified as full-time

27  agricultural lands shall be placed in a corresponding

28  agricultural zone district and shall be eligible to enter into a

1   contract, as provided by the Williamson Act . . . ."  (Pls.'

2   Opp'n Ex. X.)  However, it is far from clear that the General

3   Plan could give rise to any protected property interest because

4   "[a] general plan is not a law, but a tentative plan, subject to

5   change."  Kawaoka v. City of Arroyo Grande, 796 F. Supp. 1320,

6   1327 (C.D. Cal. 1992) (emphasis in original) (citation omitted);

7   cf. Friends of Lagoon Valley v. City of Vacaville, 154 Cal. App.

8   4th 807, 816 (1st Dist. 2007) ("Because policies in a general

9   plan reflect a range of competing interests, the governmental

10   agency . . . has broad discretion to construe its policies in

11   light of the plan's purposes.")

12          Even if the General Plan could theoretically create a

13   protected property interest, Section AG-f of the General Plan

14   does not show that plaintiffs were entitled to a Williamson Act

15   contract because it applies only to properties that are

16   "classified as full-time agricultural lands."  (See Pls.' Opp'n

17   Ex. X.)  The structure of this provision mirrors that of the

18   Williamson Act itself: although the decision to award a contract

19   is not discretionary once the land has been classified, the

20   underlying decision to classify property as full-time

21   agricultural land is a zoning decision that is ultimately

22   discretionary.  See, e.g., Sprint Telephony PCS, L.P. v. County

23   of San Diego, 543 F.3d 571, 580 (9th Cir. 2008) ("A certain level

24   of discretion is involved in evaluating any application for a

25   zoning permit.").  Because the decision to classify plaintiffs'

26   property as full-time agricultural land is discretionary,

27   plaintiffs do not have a "right to a particular zoning

28   designation," i.e., as an agricultural preserve, that is

1  protected by the Due Process Clause.  _Tyson v. City of Sunnyvale_,

2  920 F. Supp. 1054, 1061 (N.D. Cal. 1996).

3          Plaintiffs also contend that defendants have routinely

4  declined to require a separate determination of "agricultural

5  preserve" status prior to granting a Williamson Act contract.

6  (Pls.' Opp'n 14:16-18.)  Instead, they note, defendants have

7  "treated 'ag[ricultural] preserve' as a status that accompanies

8  the granting of a Williamson Act Contract."  (_Id._ at 14:13-15.)

9  Even so, defendants are not entitled to similar treatment "merely

10 because a wholly and _expressly_ discretionary state privilege has

11 been granted generously in the past."  _Conn. Bd. of Pardons v._

12 _Dumschat_, 452 U.S. 458, 465 (1981) (emphasis in original); _see_

13 _also, e.g._, _Cassidy v. Hawaii_, 915 F.2d 528, 531 (rejecting the

14 argument that, because a government agency "generally renews

15 permits," a particular individual has "a legal entitlement to

16 have his permit renewed").  Because the decision to grant a

17 Williamson Act contract or to designate land as an agricultural

18 preserve is ultimately discretionary, plaintiffs cannot have a

19 property interest in a Williamson Act contract.  See _Doyle_, 606

20 F.3d 672.

21         Absent an entitlement to a Williamson Act Contract or a

22 conditional use permit, plaintiffs have not shown that the mere

23 notification of a grading violation deprived them of any liberty

24 or property interest.  Plaintiffs contend that the issuance of

25 the grading violation deprived them of property and liberty

26 interests in their reputation because it "labeled [them] as

27 polluters."  (Pls.' Opp'n at 10:19.)  But this sort of stigma "is

28 not sufficient to satisfy the requirement that a constitutionally

1    protected . . . interest be at stake." <u>WMX Techs., Inc. v.</u>

2    <u>Miller</u>, 197 F.3d 367, 376 (9th Cir. 1999) (en banc).  While

3    plaintiffs assert that the Due Process Clause safeguards "a

4    person's reputation in the community," (Pls.' Opp'n at 10:1-2),

5    the authority they cite stands for exactly the opposite

6    proposition.  <u>See</u> <u>Paul v. Davis</u>, 424 U.S. 693, 701 (1976)

7    (denying that "reputation alone, apart from some more tangible

8    interests such as employment, is either 'liberty' or 'property'

9    by itself sufficient to invoke the procedural protection of the

10   Due Process Clause").[4]

11        In short, plaintiffs have not identified any liberty or

12   property interest of which they were deprived.[5]  Although

13   plaintiffs insist that they were nonetheless entitled to a

14

15        [4]   In addition to <u>Paul v. Davis</u>, plaintiffs cite <u>Wisconsin</u>
     <u>v. Constantineau</u>, 400 U.S. 433 (1971), in support of the
16   proposition that the Due Process Clause "extends . . . to claims
     affecting a [party's] reputation or character." (Pls. Opp'n
17   10:9.)  However, <u>Paul v. Davis</u> clarified that this holding in
     <u>Constantineau</u> applies only insofar as that reputational harm
18   deprived the plaintiff of some other liberty or property
     interest.  424 U.S. at 709-10.  Plaintiffs' contention that bare
19   reputational injury is cognizable under the Due Process Clause is
     therefore incorrect.
20
21        [5]   Plaintiffs argue that even if they had not suffered any
22   adverse action as a result of the alleged grading violation,
     defendants' failure to record or enforce the grading violation
23   left them in "limbo" and thereby deprived them of due process.
     (Pls.' Mem. at 24-25.)  A lack of enforcement action does not
24   show that plaintiffs were in limbo.  Instead, it shows that
     plaintiffs had not suffered any cognizable injury as a result of
25   the grading violation.  <u>See</u> <u>Guatay Christian Fellowship v. County</u>
     <u>of San Diego</u>, 670 F.3d 957, 984 (9th Cir. 2011) ("[T]he County's
26   [Notice of Violation] and cease-and-desist order did not
     themselves deprive the Church of any interests.  The County would
27   have had to bring an enforcement action in court to actually
     enforce the zoning regulations . . . .").
28

1   hearing to contest the alleged grading violation, their interest

2   in a hearing is not cognizable under the Due Process Clause

3   because it is an "entitlement to nothing but procedure."  Town of

4   Castle Rock v. Gonzales, 545 U.S. 748, 764 (2005).  Accordingly,

5   to the extent that plaintiffs' § 1983 claim is premised on a

6   violation of the Due Process Clause, the court must grant

7   defendants' motion for summary judgment on that claim.

8                4.   First Amendment

9        "The First Amendment forbids government officials from

10  retaliating against individuals for speaking out."  Blair v.

11  Bethel Sch. Dist., 608 F.3d 540, 543 (9th Cir. 2010).  In order

12  to succeed on their First Amendment retaliation claim, plaintiffs

13  must show that: (1) they engaged in constitutionally protected

14  activity; (2) as a result, defendants subjected plaintiffs to

15  adverse action that would chill a person of ordinary firmness

16  from continuing to engage in the protected activity; and (3) a

17  substantial causal relationship existed between plaintiffs'

18  constitutionally protected activity and defendants' adverse

19  action.  Id.

20                a.   Constitutionally Protected Activity

21        Plaintiffs contend that defendants obstructed their

22  applications for both a conditional use permit and a Williamson

23  Act contract in retaliation for plaintiffs' refusal to obtain a

24  grading permit, attempt to appeal the grading violation, and

25  lawsuits against defendants.  (Pls.' Opp'n at 19-20.)  This

26  conduct is "protected by [plaintiffs'] right to petition the

27  government" and therefore constitutes constitutionally protected

28  activity.  CarePartners, LLC v. Lashway, 545 F.3d 867, 877 (9th

1  Cir. 2008) (citing BE & K Constr. Co. v. NLRB, 536 U.S. 516, 525
2  (2002)).

3       Defendants initially concede that plaintiffs
4  "exercis[ed] their First Amendment right to petition." (Defs.'
5  Mem. at 31:12.)  In their Reply, however, defendants argue that
6  plaintiffs' retaliation claim is unfounded because plaintiffs did
7  not actually appeal the County's grading violation.  (Defs.'
8  Reply at 17 (Docket No. 141).)  Plaintiffs offer several letters
9  sent to County and State officials in 2007 and 2008 in which they
10 disputed the County's finding of a grading violation.  (See,
11 e.g., Pls.' Mem. Exs. C, E, L.)

12      Whether or not these letters constituted a formal
13 appeal of the grading violation, they are protected under the
14 Petition Clause, see 1 Annals of Cong. 738 (1789) (noting that
15 the First Amendment allows individuals to "communicate their
16 will" by writing directly to lawmakers and government officials),
17 as are the lawsuits that plaintiffs filed.  BE & K Constr. Co.,
18 536 U.S. at 525.  Plaintiffs have therefore shown that they were
19 engaged in constitutionally protected activity.

20        b.  Adverse Action

21      Plaintiffs offer evidence of three instances of adverse
22 action.  First, plaintiffs contend that Mull threatened to
23 withhold a conditional use permit for the Home Ranch winery if
24 they did not obtain a grading permit.  According to Anselmo, Mull
25 attended a meeting on February 1, 2008, about the alleged grading
26 violation at which Anselmo, Hawes, Baugh, and two other officials
27 were also present.  Anselmo avers that during this meeting, "Mull
28 shrugged his shoulders and said 'Well, if you don't pay me for a

1  grading permit up here I could hold up your CO [conditional use

2  permit] at the winery."  (Anselmo Decl. ¶ 17; Anselmo Dep. at

3  181:12-16.)  Anselmo then avers that after he threatened to sue

4  Mull, Mull responded that "[y]ou can't sue the State of

5  California" because "they have unlimited resources" and "they'll

6  tie you up in court for years."  (Id. at 184:8-19.)  If these

7  claims were true, Mull's conduct would constitute adverse action.

8  See Brodheim v. Cry, 584 F.3d 1262, 1270 (9th Cir. 2009) ("[T]he

9  mere threat of harm can be an adverse action, regardless of

10  whether it is carried out because the threat itself can have a

11  chilling effect.").

12      Second, plaintiffs contend that defendants obstructed

13  their application for a winery permit by requiring plaintiffs to

14  conduct a study to determine whether a plant known as Ahart's

15  Paronychia was present.  (Anselmo Decl. ¶¶ 22-25.)  Plaintiffs

16  received a letter dated January 30, 2008, from Bridget Dirks, an

17  Associate Planner with the County, who indicated that the

18  plaintiffs would need to conduct a "botanical survey" on their

19  property and that this survey "will need to include fish and game

20  approved mitigation measures where appropriate."  (Defs.' RJN Ex.

21  25 at 35.)  Plaintiffs contend that this study delayed their

22  application for a winery permit by several months and cost them

23  $5,000.  (Anselmo Decl. ¶ 26.)

24      Third, plaintiffs contend that the County and the Board

25  withheld approval of the Williamson Act contract in retaliation

26  for plaintiffs' protected conduct.  (See TAC ¶ 55.0.)  Plaintiffs

27  point to a series of letters they received between September 2008

28  and October 2008 from Lio Salazar, an Associate Planner with the

1   County, in which he claimed that plaintiffs could not obtain a

2   Williamson Act contract unless they first abated the grading

3   violation.  (Pls. Mem. Exs. H, J.)  Although the County Planning

4   Commission ultimately recommended that the Board of Supervisors

5   approve the Williamson Act contract, the Board ultimately did not

6   award plaintiffs the contract.  (See Dec. 16 Minutes at 10.)

7         For purposes of this motion, it may be assumed that the

8   denial of either a winery permit or a Williamson Act contract

9   would constitute adverse action even if plaintiffs "[can]not

10  establish a legally protected interest in the permits

11  themselves."  Sorrano's Gasco, Inc. v. Morgan, 874 F.2d 1310,

12  1314 (9th Cir. 1989).  However, for the reasons discussed below

13  the court finds that plaintiffs have adduced insufficient

14  evidence to show that they suffered such adverse action in

15  retaliation for exercising their speech and petition rights.

16                    c.   Causation

17        Plaintiffs must show "a substantial causal

18  relationship" between their constitutionally protected activity

19  and defendants' adverse action.  Blair, 608 F.3d at 543.  In

20  order to do so, plaintiffs must "show that the protected conduct

21  was a 'substantial' or 'motivating' factor in the defendant[s']

22  decision."  Sorrano's Gasco, 874 F.2d at 1314 (citing Mt. Healthy

23  City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

24        Because "direct evidence of improper motive . . . will

25  only rarely be available," litigants in First Amendment cases

26  typically rely on circumstantial evidence to explain why

27  defendants acted as they did.  Mendocino Envtl. Ctr. v. Mendocino

28  County, 192 F.3d 1283, 1302 (9th Cir. 1999).  For instance, a

1  plaintiff can survive summary judgment by offering evidence of

2  the "proximity in time between the protected action and the

3  allegedly retaliatory . . . decision," evidence that the

4  defendant "expressed opposition to his speech, either to him or

5  to others," or evidence that the defendant's "proffered

6  explanations for the adverse . . . action were false and

7  pretextual."  Keyser v. Sacramento City Unified Sch. Dist., 265

8  F.3d 741, 751-52 (9th Cir. 2001).  But circumstantial proof of

9  retaliatory motive requires evidence, and "speculation as to . .

10  . improper motive does not rise to the level of evidence

11  sufficient to survive summary judgment."  Karam v. City of

12  Burbank, 352 F.3d 1188, 1194 (9th Cir. 2003) (citing Keyser, 265

13  F.3d at 751).

14              i.   Mull's Conduct

15        According to plaintiffs, Mull threatened to "hold up"

16  their application for a winery permit at the Home Ranch property

17  if they did not obtain a grading permit for the Bear Creek Ranch

18  property.  (Anselmo Decl. ¶ 17; Anselmo Dep. at 181:12-16.)

19  Plaintiffs argue that Mull then followed through on this threat

20  by ordering the County to require plaintiffs to perform the

21  Ahart's Paronychia study on the Home Ranch property as a

22  condition to obtaining a permit.  (See, e.g., Anselmo Decl. ¶¶

23  21-22.)

24        Plaintiffs have offered no evidence in support of their

25  claim that Mull ordered the plant study.  Mull denies that he was

26  involved in the decision to require the plant study.  (Mull Decl.

27  ¶ 13.)  In fact, Mull claims that he was not even aware of this

28

28

1   decision, as "issues regarding CEQA[6] compliance" were made at the

2   staff level and were not brought to his attention unless there

3   was a dispute that required his input.  (Id.)  Defendants also

4   offer a declaration from Richard Simon, the current County

5   Director of Resource Management, who avers that "Mull had no

6   involvement in the study" and was not "even aware of it at that

7   time."  (Simon Decl. ¶ 23.)

8        Simon avers that Bridget Dirks, not Mull, made the

9   decision to require the plant study because the Department of

10  Fish and Game map indicated that Ahart's Paronychia might be

11  present on the Home Ranch property.  (Id.)  Dirks, not Mull,

12  initially informed plaintiffs about the study, (see Defs.' RJN

13  Ex. 25 at 35), and then required plaintiffs to perform the study

14  even after Tom Benson, a botanist and Natural Resources

15  Conservation Service engineer, wrote a letter to the County

16  indicating that plaintiffs' property did not contain hydric soils

17  that could serve as a habitat for Ahart's Paronychia.  (See

18  Anselmo Dep. at 206:20-207:14.)  Plaintiffs have therefore failed

19  to provide evidence sufficient for a fact-finder to conclude that

20  Mull was involved in the decision to impose the plant study, let

21  alone that he ordered the study in retaliation for plaintiffs'

22  exercise of their First Amendment rights.

23       Nor is plaintiffs' claim that Mull threatened to "hold

24  up" the application for a winery permit sufficient to withstand

25  summary judgment.  A defendant's conduct cannot be motivated by a

26  plaintiff's exercise of his First Amendment rights if he is

27  _____

28       [6]   CEQA is an abbreviation for the California
     Environmental Quality Act, Cal. Pub. Res. Code § 21000 et seq.

1  unaware that the plaintiff exercised those rights.  See Allen v.

2  Iranon, 283 F.3d 1070, 1076 (9th Cir. 2002) (citing Keyser, 265

3  F.3d at 750-51).  Therefore, "[t]o survive summary judgment, a

4  plaintiff alleging a First Amendment retaliation claim must

5  produce evidence that the governmental actor had knowledge of his

6  protected speech."  Occhionero v. City of Fresno, 386 Fed. App'x

7  745, 745-46 (9th Cir. 2010) (citing Dietrich v. John Ascuaga's

8  Nugget, 548 F.3d 892, 901 (9th Cir. 2008).

9       Plaintiffs contend that Mull threatened to hold up

10  their application for a winery permit at a meeting on February 1,

11  2008.  (Anselmo Decl. ¶ 17.)  Before that date, plaintiffs'

12  petitions were limited to two letters, dated November 12, 2007,

13  (Pls.' Mem. Ex. C), and January 2, 2008, (id. Ex. E), in which

14  they disputed the County's finding of a grading violation.

15  Neither letter is addressed to Mull.  In fact, Minasian's

16  November 7, 2007 letter is addressed to nine separate recipients,

17  none of whom included Mull or any employee of the County's

18  Department of Natural Resources.  (See id. Ex. C.)

19       Plaintiffs have offered no evidence that Mull was aware

20  that they had exercised their right to petition, let alone that

21  Mull threatened to withhold the winery permit in retaliation for

22  doing so.  See Occhionero, 386 Fed. App'x 745-46; see also

23  Keyser, 265 F.3d at 750-51 (concluding that summary judgment was

24  appropriate where "there [was] no evidence in the record to

25  contradict [defendant's] statement . . . that he was unaware" of

26  the protected speech).  While plaintiffs sent Mull a letter on

27  February 5, 2008, (Pls.' Mem. Ex. G), that letter cannot be the

28  cause of Mull's threat, which they allege occurred four days

1  earlier.  And even if Mull had threatened to withhold a permit

2  for the Home Ranch property, plaintiffs have offered no evidence

3  to dispute Mull's claim that he did so because he witnessed

4  grading on the Bear Creek Ranch property, rather than because of

5  any retaliatory motive.  (See Mull Decl. ¶ 7.)   Accordingly, to

6  the extent that plaintiffs' First Amendment claim is based on

7  Mull's conduct, the court must grant defendants' motion for

8  summary judgment.

9                   ii.  Delay of the Winery Permit

10         Plaintiffs also contend that the County retaliated

11  against them by requiring them to perform the plant study on the

12  Home Ranch property.  (Anselmo Decl. ¶¶ 21-22; Pls.' Opp'n 22:5.)

13  Defendants argue that the County mandated this study not because

14  of plaintiffs' exercise of their First Amendment rights, but

15  because a routine environmental review of their permit

16  application disclosed that Ahart's may be present on the Home

17  Ranch property.  (Defs.' SUF ¶¶ 64-67; Simon Decl. ¶¶ 16-17;

18  Dirks Decl. ¶ 5.)  Because the State of California lists Ahart's

19  as a "species of concern," the County concluded that the

20  California Environmental Quality Act ("CEQA") required it to

21  mandate the plant study as a condition of obtaining a conditional

22  use permit.  (Defs.' SUF ¶ 67; Dirks Decl. ¶ 5.)

23         Plaintiffs have not shown that this rationale was a

24  pretext for retaliation.  Plaintiffs point to deposition

25  testimony from their attorney, Bart Fleharty, (Flaherty Dep. at

26  52:2-3, 52:10-14), and from plant biologist Richard Lis, (Lis

27  Dep. at 89-91), indicating that the decision to require the plant

28  study was discretionary.  Even if plaintiffs were correct that

the plant study was discretionary, that alone is not proof that County officials exercised that discretion in a retaliatory manner.  Cf. Rosenbaum v. City & County of San Francisco, 484 F.3d 1142, 1161 (9th Cir. 2006) (holding that city's exercise of discretion in awarding amplified noise permits was not sufficient to show viewpoint discrimination against unsuccessful permit applicants).  And while proof of a "lack of clarity and even-handedness in the policy's implementation" may be sufficient circumstantial evidence of retaliation, Coszalter v. City of Salem, 320 F.3d 968, 978 (9th Cir. 2003), plaintiffs offer no such evidence.

Plaintiffs offer deposition testimony indicating that Tom Benson, a botanist and Natural Resources Conservation Service engineer, wrote a letter to the County's resources management division indicating that plaintiffs' property did not contain hydric soils that could serve as a habitat for Ahart's Paronychia.  (Anselmo Dep. at 206:20-25.)  Anselmo then testified that after receiving Benson's letter, the County nonetheless required plaintiffs to conduct the study, resulting in further costs and delay.  (Id. at 207:2-14.)

True as this may be, it is insufficient evidence from which to infer retaliatory motive.  Defendants contend – and plaintiffs admit – that Dirks contacted Dr. Lis, who then worked for the Department of Fish and Game, to ask whether Benson's letter was sufficient to satisfy the requirement for a plant study.  (Pls.' Resp. to Defs.' SUF, ¶ 71; Dirks Decl. ¶ 6.)  Lis then informed Dirks that Benson's letter was not sufficient because he was not a licensed botanist and because Benson's

1  report did not seem to reflect familiarity with where Ahart's

2  "really grew."  (Lis Dep. at 96:3-22.)

3         Plaintiffs offer no evidence that this reason was a

4  pretext for retaliation.  And while plaintiffs characterize the

5  plant study as "burdensome and atypical," (Pls.' Opp'n at 22:5),

6  they provide no evidence showing that the County's environmental

7  compliance policy was not applied in an "even-handed" way to

8  other permit applicants.  Coszalter, 320 F.3d at 978.

9         Plaintiffs offer no other proof of a causal connection

10 between their dispute of the grading violation and the County's

11 decision to require the plant study.  Although the County

12 required the plant study only three months after plaintiffs first

13 disputed the grading violation, "mere temporal proximity" is

14 ordinarily not evidence of causation.  Clark Cnty. Sch. Dist. v.

15 Breeden, 532 U.S. 268, 273 (2001).  Rather, temporal proximity is

16 relevant only as part of the "totality of the facts."  Coszalter,

17 320 F.3d at 978; see also Coszalter, 320 F.3d at 978 ("[T]here is

18 no set time within which acts necessarily support an inference of

19 retaliation.").  Absent other evidence of a causal connection

20 between the plant study and plaintiffs' protected activity, a

21 three-month gap in time does not permit a factfinder to infer

22 retaliatory motive.

23         As explained above, there is also no evidence that Mull

24 ordered the plant study, or that anyone involved in ordering the

25 plant study was aware of plaintiffs' exercise of their First

26 Amendment rights.  Accordingly, to the extent that plaintiffs'

27 First Amendment claim is based on the decision to require a study

28 to detect whether Ahart's Paronychia was present, the court must

1  grant defendants' motion for summary judgment on that claim.

2  iii.  <u>Denial of the Williamson Act Contract</u>

3  Finally, plaintiffs contend that Hawes and Baugh

4  recused themselves in order to deny plaintiffs two of the three

5  votes needed to obtain a Williamson Act contract.  Although Hawes

6  and Baugh contend that they recused themselves because of a

7  conflict of interest, plaintiffs have argued since filing their

8  Third Amended Complaint that this "was a bad faith pretext to

9  bring about what they believed would constitute a denial of

10  Plaintiffs' application."  (TAC ¶ 55.0.)

11  Plaintiffs do not dispute that they sued Hawes and

12  Baugh on October 2, 2008.  (See Defs.' RJN Ex. 24.)  As a result,

13  Hawes and Baugh rightly recused themselves from voting on

14  plaintiffs' application for a Williamson Act contract.[7]  (Baugh

15  Decl. ¶ 12; Hawes Decl. ¶ 15.)  Had they not done so, Hawes and

16  Baugh not only would have exposed themselves to charges of bias

17  and partiality, but would have exposed themselves to potential

18  liability had they voted to deny plaintiffs' application.  <u>See</u>

19  <u>Stivers v. Pierce</u>, 71 F.3d 732, 750 (9th Cir. 1995) (holding that

20  a licensing board member was liable for voting against

21  plaintiff's license application because his "opposition to

22  [plaintiff's] application was motivated by his own personal

23  bias").

24  Plaintiffs have not shown that this reason was a "bad

25

26  [7]  Although it does not use mandatory language, Rule 9(b)
of the Board's Administrative Manual specifically contemplates
27  that Supervisors will disqualify themselves in the event of a
conflict of interest.  (<u>See</u> Admin. Policy 1-101 (Defs.' RJN Ex.
28  5).)

1    faith pretext" for retaliation.  (See TAC ¶ 55.0.)  Plaintiffs

2    offer evidence that Hawes attempted to persuade them to purchase

3    mitigation credits to resolve the grading violation, (Anselmo

4    Decl. ¶¶ 16.0-16.1), and that Baugh informed them that they could

5    resolve the grading violation by obtaining an "administrative

6    permit" for a hydroelectric generator.  (Id. ¶¶ 23-24.)  Even if

7    these claims were correct, plaintiffs' evidence does not show

8    that Hawes and Baugh recused themselves because plaintiffs

9    refused these overtures, let alone that Hawes and Baugh recused

10   themselves in retaliation for exercising their right to petition.

11          Finally, Anselmo avers that Hawes and Baugh "stood up

12   with a nod to each other" just before the vote on the Williamson

13   Act contract was set to occur.  (Anselmo Dep. at 215:20-21.)

14   This is not evidence of retaliatory motive, of an agreement

15   between Hawes and Baugh, or of anything at all.  Plaintiffs'

16   belief that Hawes and Baugh "acted from an unlawful motive,

17   without evidence supporting that belief, is no more than

18   speculation or unfounded accusation about whether the

19   defendant[s] really did act from an unlawful motive."  Carmen v.

20   S.F. Unified Sch. Dist., 237 F.3d 1026, 1028 (9th Cir. 2001).  To

21   the extent that plaintiffs' First Amendment claim is premised on

22   Hawes' and Baugh's conduct, the court must grant defendants'

23   motion for summary judgment.

24          Although plaintiffs have shown that they engaged in

25   constitutionally protected activity and that they suffered

26   adverse action, they have failed to provide the evidence crucial

27   to establishing a causal link between the two.  Plaintiffs'

28   allegations of retaliation are "entirely speculative," and

1    "[t]here is no specific, admissible evidence in the voluminous

2    record that the plaintiffs can cite to support their claims that

3    any of the defendants sought to enforce the law on account of a

4    retaliatory animus . . . ."  CarePartners LLC v. Lashway, 428

5    Fed. App'x 734, 735 (9th Cir. 2011).  Accordingly, to the extent

6    that plaintiffs' § 1983 claim is premised on a violation of the

7    First Amendment, the court must grant defendants' motion for

8    summary judgment.[8]

9         B.   Writ of Mandate

10   ───────────────────────

11       [8]   Although the court does not reach this issue, it is
     likely that Hawes, Baugh, and Mull would be entitled to qualified
     immunity even if plaintiffs' evidence were sufficient to survive
12   summary judgment on their First Amendment claim.  In actions
     under § 1983, "qualified immunity protects government officials
13   'from liability for civil damages insofar as their conduct does
     not violate clearly established statutory or constitutional
14   rights of which a reasonable person should have known."  Pearson
     v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v.
15   Fitzgerald, 457 U.S. 800, 818 (1982)).
         The "clearly established" inquiry "assesses the
16   objective reasonableness of the official's conduct in light of
     the decisional law at the time."  Moss v. U.S. Secret Serv., 675
17   F.3d 1213, 1222 (9th Cir. 2012).  Whether or not plaintiffs could
     identify a clearly established right that defendants purportedly
18   violated, it is unlikely that the court would conclude that any
     of the conduct at issue here – including Mull's statement that a
19   permit may be denied because of outstanding grading violation,
     the imposition of the plant study, or the denial of the
20   Williamson Act contract — is objectively unreasonable.  See id.;
     see also Malley v. Briggs, 475 U.S. 335, 341 (1986) (noting that
21   qualified immunity "provides ample protection to all but the
     plainly incompetent or those who knowingly violate the law.").
22       Even if plaintiffs had evidence sufficient to show
     retaliatory animus, which they do not, that evidence would not be
23   "sufficient to defeat immunity if the defendant[s] acted in an
     objectively reasonable manner."  Id.; see also Crawford-El v.
24   Britton, 523 U.S. 574, 588 (1998) ("[A] defense of qualified
     immunity may not be rebutted by evidence that the defendant[s']
25   conduct was malicious or improperly motivated.  Evidence
     concerning the defendant[s'] subjective intent is simply
26   irrelevant to that defense.").

27

28
                              36

1        Under California law, "it is well settled that although

2   a court may issue a writ of mandate requiring legislative or

3   executive action to conform to the law, it may not substitute its

4   discretion for that of legislative or executive bodies in matters

5   committed to the discretion of those bodies."  Common Cause v.

6   Bd. of Supervisors, 49 Cal. 3d 432, 445 (1989).  "[A]lthough a

7   court may order a local legislative body to perform a

8   nondiscretionary ministerial act, it may not control a local

9   board's discretion."  Id. (citing Glendale City Emps. Ass'n, Inc.

10  v. City of Glendale, 15 Cal. 3d 328, 324 (1975)).

11       As explained above, see infra Part IV.A.3, the decision

12  to award or deny a Williamson Act contract or to designate a

13  parcel of land as an agricultural preserve is discretionary.  See

14  Kelsey, 30 Cal. App. 3d at 595.  Accordingly, the court must

15  grant defendants' motion for summary judgment with respect to

16  plaintiffs' claim for a writ of mandate to compel the award of a

17  Williamson Act contract.

18       IT IS THEREFORE ORDERED that plaintiffs' motion for

19  summary judgment be, and the same hereby is, DENIED, and that

20  defendants' motion for summary judgment be, and the same hereby

21  is, GRANTED.

22  Dated:  October 28, 2013

23

WILLIAM B. SHUBB
24  UNITED STATES DISTRICT JUDGE

25

26

27

28