1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11                         ----oo0oo----

12  REVERGE ANSELMO and SEVEN HILLS      CIV. NO. 2:12-01422 WBS EFB
    LAND AND CATTLE COMPANY, LLC,
13                                       MEMORANDUM & ORDER RE: MOTIONS
              Plaintiffs,                FOR SUMMARY JUDGMENT
14
          v.
15
    RUSS MULL, LESLIE MORGAN,
16  Shasta County Assessor-
    Recorder, COUNTY OF SHASTA,
17  BOARD OF SUPERVISORS OF THE
    COUNTY OF SHASTA, LES BAUGH,
18  and GLENN HAWES,

19            Defendants.

20

21

22                         ----oo0oo----

23        Plaintiffs Reverge Anselmo and Seven Hills Land and

24  Cattle Company, LLC brought this action against defendants County

25  of Shasta, California ("the County"), the Board of Supervisors of

26  Shasta County ("the Board"), Leslie Morgan, Russ Mull, Les Baugh,

27  and Glenn Hawes arising out of a series of land use disputes

28  beginning in 2007.  Plaintiffs seek damages and injunctive relief

                                    1

1    under 42 U.S.C. § 1983, as well as a writ of mandate compelling

2    defendants to award plaintiffs a land conservation contract

3    pursuant to the California Land Conservation Act of 1965 ("the

4    Williamson Act"), Cal. Gov't Code § 51200 et seq.  The parties

5    both move for summary judgment pursuant to Federal Rule of Civil

6    Procedure 56.

7    I.   Factual & Procedural History

8         Plaintiffs own and operate two properties in Shasta

9    County that are at issue in this action.  Since at least 2006,

10   plaintiffs have owned and operated Home Ranch, a 1200-acre

11   property located in the Inwood Valley.  (See Anselmo Decl. ¶ 27

12   (Docket No. 139-5).)  In 2007, plaintiffs purchased Bear Creek

13   Ranch, a 670-acre property located three miles away from Home

14   Ranch, which they planned to utilize for raising cattle.  (Id. ¶

15   2.)

16        After purchasing Bear Creek Ranch, plaintiffs began

17   clearing the property of weeds, vines, bushes, and dead or dying

18   trees in order to replant the pasture areas of the property.

19   (Id. ¶¶ 2-3.)  California Regional Water Quality Control Board

20   employee Andrew Jensen received a report in October 2007 of

21   potential violations of state and federal water quality laws at

22   Bear Creek Ranch.  (Decl. of Andrew Jensen in Supp. of Mot. for

23   Summ. J. ("Jensen Decl.") ¶ 3 (Docket No. 133-1).)  Jensen

24   initiated an investigation of the alleged violations and visited

25   Bear Creek Ranch several times.  (Id.)  On October 15, 2007,

26   Jensen directed Garrett Glauzer, a construction foreman at Bear

27   Creek Ranch, to cease operations.  (Id. Ex. 2.)  Jensen

28   reiterated this direction to Anselmo the next day, (id.), and

1  prepared a report documenting his findings and a Cleanup and
2  Abatement Order, which he issued to the County.  (Jensen Decl. ¶¶
3  3, 6.)

4          On October 30, 2007, plaintiffs received a letter from
5  James Smith, an Environmental Health Division Manager with the
6  County, stating that plaintiffs had violated the County's grading
7  ordinance by engaging in grading activities without a valid
8  grading permit.  (Pls.' Mem. Ex. B. (Docket No. 134-9).)  Paul
9  Minasian, an attorney for plaintiffs, sent Smith a letter on
10 November 12, 2007, disputing the finding of a grading violation
11 and contending that plaintiffs' activities were exempt under the
12 County's grading ordinance.  (Id. Ex. C.)  Smith responded in a
13 letter dated December 20, 2007, that the alleged grading
14 activities were not exempt because they had occurred in and
15 adjacent to a drainage way.  (Id. Ex. D.)  Minasian sent Smith a
16 response on January 2, 2008, in which he reiterated plaintiffs'
17 position that they had not violated the grading ordinance.  (Id.
18 Ex. E.)

19         In December 2007, Anselmo invited Glenn Hawes, a member
20 of the Board, to Bear Creek Ranch to discuss the grading
21 violation.  (Anselmo Decl. ¶ 16.)  Anselmo testified that Hawes
22 saw the work that was being done on the property and stated that
23 "he did not understand how it could be claimed that this was
24 grading that required a permit."  (Id.)  Anselmo avers that Hawes
25 advised him to buy mitigation credits and offer them to the
26 County "in order to end the harassment" and that Hawes
27 "explicitly mentioned his Stillwater Plains Mitigation Bank as a
28 potential candidate for those mitigation credits."  (Id.)

3

1   Anselmo refused this offer.  (Id. ¶ 16.1.)  Although defendants

2   contest plaintiffs' narration of these events, they concede that

3   this meeting occurred, (see Hawes Decl. ¶¶ 7-10 (Docket No.

4   135)), and that Hawes stated that Anselmo "might be able to

5   resolve the violations" by purchasing a conservation easement for

6   the Home Ranch property.  (Id. ¶ 8; Defs.' Statement of

7   Undisputed Facts ("Defs.' SUF") ¶ 47 (Docket No. 133-32).)

8          Anselmo then requested an additional meeting with

9   Hawes, Supervisor Les Baugh, Russ Mull, the Director of the

10  County's Resource Management Department, and Larry Lees, the

11  County Administrative officer.  (Anselmo Decl. ¶ 17.)  This

12  meeting took place on February 1, 2008, and was also attended by

13  Willy Preston, the legislative aide for then-Assemblyman Doug

14  LaMalfa.  (Id.)  Anselmo avers that at this meeting, Mull

15  threatened to obstruct his application for a permit to operate a

16  winery at the Home Ranch property if he did not obtain a grading

17  permit.  (Anselmo Dep. at 181:12-16.)  Although Mull claims that

18  he "did not tell Mr. Anselmo that I would hold up his certificate

19  of occupancy at the Winery Property," he admits that he "told him

20  that . . . a landowner may be denied future discretionary permits

21  if there are outstanding violations on the property."  (Decl. of

22  Russ Mull ("Mull Decl.") ¶ 9 (Docket No. 135-2).)

23         After this meeting, Anselmo called Baugh and asked if

24  there was any other way to cure the grading violation.  (Anselmo

25  Decl. ¶ 23; Baugh Decl. ¶ 11 (Docket No. 135-1).)  Baugh then

26  contacted Mull and asked what could be done to resolve the

27  grading violation.  (Id.; Mull Decl. ¶ 10.)  Mull responded that

28  if plaintiffs obtained a hydroelectric permit for the Bear Creek

4

1  Ranch property, it could encompass the grading violation.  (Id.)

2  Baugh relayed this message to Anselmo, (Baugh Decl. ¶ 12), who

3  interpreted it as a request for a "face-saving measure."

4  (Anselmo Decl. ¶ 24.)

5          In the meantime, Bridget Dirks, an Associate Planner

6  with the County, sent plaintiffs a letter on January 30, 2008,

7  stating that plaintiffs would need to conduct a "botanical

8  survey" on the Home Ranch property to determine whether a plant

9  known as Ahart's Paronychia was present.  (Defs.' Request for

10 Judicial Notice ("Defs.' RJN") Ex. 25 at 35 (Docket No. 133-29).)

11 Anselmo avers that he had the Home Ranch property examined by Tom

12 Benson, a botanist and Natural Resources Conservation Service

13 engineer.  (Anselmo Dep. at 206:20-25.)  Anselmo avers that

14 Benson wrote a letter to the County's resources management

15 division indicating that plaintiffs' property did not contain

16 hydric soils that could serve as a habitat for Ahart's

17 Paronychia.  (Id.)  Dirks nonetheless required plaintiffs to

18 conduct the plant study, which plaintiffs contend delayed the

19 approval of their application for a permit for the proposed

20 winery project by several months and cost an additional $5,000.

21 (Id. at 207:2-14; Anselmo Decl. ¶ 26.)

22         On September 3, 2008, plaintiffs received a letter from

23 Lio Salazar, an Associate Planner with the County, stating that

24 their application for a land conservation contract for the Bear

25 Creek Ranch property ("Williamson Act contract") could not move

26 forward until the grading violations were remedied.[1]  (Pls.' Mem.

27 ───────────────

28         [1]    The Williamson Act authorizes cities and counties in
    California to offer a land conservation contract to owners of

5

1   Ex. H.)  Salazar reiterated this position in a letter sent on

2   October 8, 2008.  (Id. Ex. J.)

3          Plaintiffs sent a letter to the Board, Mull, and

4   Michael Ralston, the Shasta County Counsel, on October 14, 2008.

5   (Id. Ex. L.)  In this letter, plaintiffs contested the finding of

6   a grading violation, argued that the County failed to serve a

7   Notice of Non-Compliance with the grading violation, claimed that

8   they had been denied an opportunity to appeal the grading

9   violation, and threatened further legal action if the Williamson

10  Act contract was not approved.[2]  (Id.)  Following this letter,

11  the County Planning Commission unanimously recommended that the

12  Board conduct a public hearing and grant plaintiffs' application

13  for a Williamson Act contract.  (Id. Exs. 2-3.)

14         On December 16, 2008, the Board held a meeting at which

15  plaintiffs' application for a Williamson Act was placed on the

16  agenda.  (See Minutes, Shasta Cnty Bd. of Supervisors, Dec. 16,

17  2008 ("Dec. 16 Minutes") (Defs.' RJN Ex. 7) (Docket No. 133-35).)

18  Before the Board considered the contract, it considered the more

19  _____

20  agricultural land meeting certain statutory requirements.  Cal.
    Gov't Code § 51240.  In exchange for agreeing to maintain their
21  property as full-time agricultural land, the owner of land
    subject to a Williamson Act contract receives favorable tax
22  treatment on that land.  Cal. Rev. & Tax. Code § 423.3.  The
    State of California provides subvention payments to cities and
23  counties who enter into Williamson Act contracts in order to
    offset the lost tax revenue.  Cal. Gov't Code § 16142.
24
         [2]   Shortly before mailing this letter, plaintiffs filed
25  the precursor to this lawsuit in Shasta County Superior Court on
    October 2, 2008.  (Defs.' RJN Ex. 24.)  Plaintiffs named the
26  County, Jensen, and Mull as defendants and also sued Hawes &
    Baugh as Doe defendants.  Id.  Plaintiffs and Jensen agreed to a
27  stipulated dismissal of the state court action in June 2009.
    (Docket No. 139-3.)
28

                                    6

1  general question of whether the County should place a moratorium
2  on all new Williamson Act contracts in light of the possibility
3  that the State of California would discontinue subvention
4  payments.  (Id. at 8.)  County staff estimated that the County
5  could lose as much as $125,000 per year if these payments ceased.
6  (Id.)  Although the Board put this issue up for a vote, it failed
7  by a 4-1 margin.  (Id.)  Only Supervisor David Kehoe voted in
8  favor of the motion.  (Id.)

9          The Board then considered plaintiffs' application for a
10 Williamson Act contract.  (Id. at 9-10.)  Hawes and Baugh recused
11 themselves from this vote.  (Id. at 9.)  While Hawes and Baugh
12 contend that they recused themselves because they had been named
13 as defendants in a suit brought by plaintiffs, (see Hawes Decl. ¶
14 12; Baugh Decl. ¶ 15), plaintiffs argue that this "was a bad
15 faith pretext to bring about what they believed would constitute
16 a denial of Plaintiffs' application."  (Third Am. Compl. ("TAC")
17 ¶ 55.0 (Docket No. 1-2).)  The remaining three Supervisors then
18 considered plaintiffs' application for a Williamson Act contract.
19 (Dec. 16 Minutes at 10.)  Supervisors Cibula and Hartman voted in
20 favor of awarding the contract, while Kehoe voted against it and
21 reiterated his earlier concerns about discontinued subvention
22 payments.  (Id.)  As a result, plaintiffs did not receive a
23 Williamson Act contract for Bear Creek Ranch.  (Id.)

24         Plaintiffs amended their Complaint in February, May,
25 and August 2009 to name Baugh, Hawes, the Board, and Leslie
26 Morgan, the County Assessor-Recorder as defendants and to add
27 allegations arising out of the Board's decision to deny
28 plaintiffs a Williamson Act contract.  (See TAC 1.)  On May 11,

1   2012, defendants filed a cross-complaint against plaintiffs for

2   violation of the Unfair Competition Law, Cal. Bus. & Prof. Code §

3   17200 et seq. and public nuisance, as well as third-party claims

4   against Jensen, Nancy Haley, Matthew Rabbe, and Matthew Kelley

5   for contribution and indemnity.  (Docket No. 1-1.)  The United

6   States then removed the action to this court pursuant to 28

7   U.S.C. § 1346(b) on the basis that Haley, Rabbe, and Kelley were

8   federal employees sued for torts arising out of the scope of

9   their employment.  (Docket No. 1.)

10          The court dismissed defendants' third-party claims

11   against Haley, Rabbe, and Kelley on September 21, 2012, (Docket

12   No. 58), and dismissed defendants' third-party claims against

13   Jensen on October 11, 2012.  (Docket No. 91.)  Defendants then

14   filed separate counterclaims against plaintiffs on December 5,

15   2012 for public nuisance and violation of the Unfair Competition

16   Law.  (Docket No. 102.)  On March 18, 2013, the court remanded

17   defendants' counterclaims to Shasta County Superior Court and

18   retained jurisdiction over only plaintiffs' § 1983 and writ of

19   mandate claims.  (Docket No. 117.)  On September 6, 2013, both

20   parties filed motions for summary judgment on those two claims.

21   (Docket Nos. 133-134.)

22   II.  Legal Standard

23          Summary judgment is proper "if the movant shows that

24   there is no genuine dispute as to any material fact and the

25   movant is entitled to judgment as a matter of law."  Fed. R. Civ.

26   P. 56(a).  A material fact is one that could affect the outcome

27   of the suit, and a genuine issue is one that could permit a

28   reasonable jury to enter a verdict in the non-moving party's

1  favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

2  (1986).  The party moving for summary judgment bears the initial

3  burden of establishing the absence of a genuine issue of material

4  fact and can satisfy this burden by presenting evidence that

5  negates an essential element of the non-moving party's case.

6  Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

7  Alternatively, the moving party can demonstrate that the non-

8  moving party cannot produce evidence to support an essential

9  element upon which it will bear the burden of proof at trial.

10  Id.

11      Once the moving party meets its initial burden, the

12  burden shifts to the non-moving party to "designate 'specific

13  facts showing that there is a genuine issue for trial.'"  Id. at

14  324 (quoting then-Fed. R. Civ. P. 56(e)).  To carry this burden,

15  the non-moving party must "do more than simply show that there is

16  some metaphysical doubt as to the material facts."  Matsushita

17  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

18  "The mere existence of a scintilla of evidence . . . will be

19  insufficient; there must be evidence on which the jury could

20  reasonably find for the [non-moving party]."  Anderson, 477 U.S.

21  at 252.

22      In deciding a summary judgment motion, the court must

23  view the evidence in the light most favorable to the non-moving

24  party and draw all justifiable inferences in its favor.  Id. at

25  255.  "Credibility determinations, the weighing of the evidence,

26  and the drawing of legitimate inferences from the facts are jury

27  functions, not those of a judge . . . ruling on a motion for

28  summary judgment . . . ."  Id.

9

1    III. <u>Evidentiary Objections</u>

2             On a motion for summary judgment, "[a] party may object

3    that the material cited to support or dispute a fact cannot be

4    presented in a form that would be admissible in evidence."  Fed.

5    R. Civ. P. 56(c)(2).  "[T]o survive summary judgment, a party

6    does not necessarily have to produce evidence in a form that

7    would be admissible at trial, as long as the party satisfies the

8    requirements of Federal Rules of Civil Procedure 56."  <u>Fraser v.</u>

9    <u>Goodale</u>, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (quoting <u>Block v.</u>

10   <u>City of Los Angeles</u>, 253 F.3d 410, 418–19 (9th Cir. 2001))

11   (internal quotation marks omitted).  Even if the non-moving

12   party's evidence is presented in a form that is currently

13   inadmissible, such evidence may be evaluated on a motion for

14   summary judgment so long as the moving party's objections could

15   be cured at trial.  <u>See</u> <u>Burch v. Regents of the Univ. of Cal.</u>,

16   433 F. Supp. 2d 1110, 1119–20 (E.D. Cal. 2006) (Shubb, J.).

17            Defendants raise dozens of objections to the evidence

18   offered alongside plaintiffs' Motion for Summary Judgment,

19   (Docket No. 138-1), and the evidence offered alongside

20   plaintiffs' Opposition. (Docket No. 141-1).)  Defendants'

21   objections based on compound phrasing are inappropriate because

22   the evidence could be presented in an admissible form at trial,

23   <u>see</u> <u>Burch</u>, 433 F. Supp. 2d. at 1119-20, and the court will

24   overrule them.  The court does not rely on any of the evidence

25   that defendants characterize as hearsay, and the court will

26   therefore overrule these objections as moot.

27            Defendants' objections to evidence on the basis of lack

28   of foundation, speculation, or relevance are all duplicative of

                                    10

1    the summary judgment standard itself.  See id.  A court can award

2    summary judgment only when there is no genuine dispute of

3    material fact.  Statements based on improper legal conclusions or

4    without personal knowledge are not facts and can only be

5    considered as arguments, not as facts, on a motion for summary

6    judgment.  Instead of challenging the admissibility of this

7    evidence, lawyers should challenge its sufficiency.  Objections

8    on any of these grounds are superfluous, and the court will

9    overrule them.

10        Defendants specifically object to paragraph 11 of

11   Anselmo's declaration, as well as plaintiffs' Exhibit C,

12   consisting of a letter sent by Paul Minasian on November 12,

13   2007, on the basis that this evidence violates the "sham

14   affidavit" rule.  (Defs.' Objections to Pls.' Evidence in Opp'n ¶

15   3.)  Defendants argue that Anselmo's characterization of this

16   letter as an "appeal" of the grading violation is a sham because

17   it contradicts his earlier deposition testimony that this letter

18   was not intended as an appeal of the County's grading violation.

19   (Id.)

20        The sham affidavit rule prohibits a party from creating

21   a factual dispute by an affidavit contradicting his prior

22   deposition testimony.  Nelson v. City of Davis, 571 F.3d 924,

23   927-28 (9th Cir. 2009).  The sham affidavit rule does not "cover

24   all instances when evidence conflicts with the party's

25   testimony."  Id. at 929.  Nor does it prohibit a party "from

26   elaborating upon, clarifying, or explaining prior testimony

27   elicited by opposing counsel on deposition; minor inconsistencies

28   that result from an honest discrepancy, a mistake, or newly

1   discovered evidence afford no basis for excluding an opposition

2   affidavit." <u>Messick v. Horizon Indus.</u>, 62 F.3d 1227, 1231 (9th

3   Cir. 1995).

4        Defendants are correct that Anselmo's affidavit is

5   inconsistent with his prior deposition testimony that the letters

6   sent by Minasian on November 12, 2007, and January 2, 2008, were

7   "not the written appeals . . . sent on [Anselmo's] behalf."

8   (Anselmo Dep. at 152:21-23.)  However, Paragraph 11 of Anselmo's

9   affidavit accurately states that Minasian sent defendants a

10  letter on November 12, 2007, and that this letter expressed

11  plaintiffs' position that their conduct did not require a grading

12  permit.  (Anselmo Decl. ¶ 11.)

13       As this Order makes clear, whether or not Minasian's

14  letters constituted a formal appeal of the grading violation is

15  immaterial; what is important is that those letters were received

16  by defendants and that they disputed the County's finding of a

17  grading violation.  For this reason--and out of an abundance of

18  caution--the court will sustain defendants' objection as to the

19  words "appealing the determination . . . and" on line 3 of

20  paragraph 11 and will overrule the objection as to the remainder

21  of Anselmo's affidavit and Minasian's letter itself.

22  IV.  <u>Discussion</u>

23       A.   <u>Claims Brought Under 42 U.S.C. § 1983</u>

24            In relevant part, § 1983 provides:

25       Every person who, under color of any statute,
         ordinance, regulation, custom, or usage, of any State
26       . . . , subjects, or causes to be subjected, any
         citizen of the United States . . . to the deprivation
27       of any rights, privileges, or immunities secured by
         the Constitution and laws, shall be liable to the
28       party injured in an action at law, suit in equity or

                                    12

1     other proper proceeding for redress . . . .

2

3   42 U.S.C. § 1983.  While § 1983 is not itself a source of

4   substantive rights, it provides a cause of action against any

5   person who, under color of state law, deprives an individual of

6   federal constitutional rights or limited federal statutory

7   rights.  Id.; Graham v. Connor, 490 U.S. 386, 393-94 (1989).

8         Plaintiffs bring four claims against all defendants

9   under § 1983 for: (1) deprivation of their property without just

10  compensation in violation of the Fifth Amendment; (2) violation

11  of the Fourteenth Amendment Equal Protection Clause; (3)

12  deprivation of procedural and substantive due process in

13  violation of the Fourteenth Amendment; and (4) retaliation for

14  conduct protected by the First Amendment.  (TAC ¶ 60.0.)

15  Plaintiffs seek damages, injunctive relief, and a writ of mandate

16  to compel the award of a contract pursuant to the Williamson Act.

17  (Id.)  Defendants seek summary judgment on each of these claims.

18        1.   Takings Clause

19        The Fifth Amendment prohibits the taking of private

20  property for public use without just compensation.  U.S. Const.

21  amend. V.  However, "if a state provides an adequate procedure

22  for seeking just compensation, the property owner cannot claim a

23  violation of the Just Compensation Clause until it has used the

24  procedure and been denied just compensation."  Williamson Cnty.

25  Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S.

26  172, 195 (1985).  California allows landowners to pursue inverse

27  condemnation remedies in state court.  See Cal. Const. Art. I. §

28  19; San Diego Gas & Elec. Co. v. Superior Court, 13 Cal. 4th 893

13

1    (1996).  Consequently, a plaintiff alleging a taking of his

2    property without just compensation generally must pursue his

3    claim through state inverse condemnation proceedings before

4    bringing his claim in federal court.  See, e.g., Williamson

5    Cnty., 473 U.S. at 196-97; Guggenheim v. City of Goleta, 638 F.3d

6    1111, 1117 (9th Cir. 2010).

7            Plaintiffs offer no evidence that they pursued state

8    inverse condemnation remedies prior to bringing this action.

9    Rather, plaintiffs assert that they are not required to bring an

10   inverse condemnation action "as a condition of enforcing their

11   rights to procedural due process and equal protection." (Pls.'

12   Opp'n at 31 (Docket No. 139).)  Even so, plaintiffs do not

13   dispute that they must resort to state inverse condemnation

14   remedies prior to bringing a § 1983 claim premised on an

15   unconstitutional taking of their property.  Accordingly, insofar

16   as plaintiffs' § 1983 claim is premised on a violation of the

17   Takings Clause, the court must grant defendants' motion for

18   summary judgment.

19            2.   Equal Protection Clause

20            Plaintiffs argue that defendants violated their rights

21   under the Equal Protection Clause by refusing to grant plaintiffs

22   a Williamson Act contract, even though defendants granted

23   contracts to similarly situated landowners.  (Pls.' Mem. at 9-

24   15).  The Equal Protection Clause guarantees that "[n]o state

25   shall . . . deny to any person within its jurisdiction the equal

26   protection of the laws."  U.S. Const. amend. XIV, § 1.  The

27   Supreme Court has recognized equal protection claims based the

28   theory that the plaintiff "has been irrationally singled out as a

                                    14

so-called 'class of one.'"  Enquist v. Or. Dep't of Agric., 553
U.S. 591, 601 (2008) (citing Village of Willowbrook v. Olech, 528
U.S. 562, 564 (2000) (per curiam)).

In order to succeed on their "class of one" claim,
plaintiffs must show that defendants: "(1) intentionally (2)
treated [plaintiffs] differently than other similarly situated
property owners, (3) without a rational basis."  Gerhart v. Lake
County, 637 F.3d 1013, 1022 (9th Cir. 2011) (citing Olech, 528
U.S. at 564).  For purposes of a "class of one" claim, a
defendant's conduct "comports with equal protection if there is
any reasonably conceivable state of facts that could provide a
rational basis for the classification."  SeaRiver Mar. Fin.
Holdings v. Mineta, 309 F.3d 662, 679 (9th Cir. 2002) (citations
and internal quotation marks omitted); accord Vance v. Bradley,
440 U.S. 93, 111 (1979) (holding that rational basis scrutiny
requires a plaintiff to show that the "facts on which the
classification is apparently based could not reasonably be
conceived to be true by the governmental decisionmaker").

Defendants have demonstrated a rational basis for the
Board's decision to deny it a Williamson Act contract.  Rule 9(a)
of the County's Administrative Manual provides that "[a]n
affirmative vote of three members is necessary for the Board to
take action" on any item placed on the Board's agenda.  (Admin.
Policy 1-101 (Defs.' RJN Ex. 5) (Docket No. 133-34).)  Rule 9(b)
of the Administrative Manual states that a Supervisor may abstain
from voting based on an actual or perceived conflict of interest
and that, if he does so, the abstention "shall count as a non-
vote."  (Id.)  Neither party disputes that Hawes and Baugh

15

1    recused themselves from voting on whether to approve plaintiffs'

2    application for a Williamson Act contract at the Board's meeting

3    on December 16, 2008.  (Dec. 16 Minutes at 9.)  As a result, the

4    Board could only approve the Williamson Act contract if the

5    remaining three supervisors voted unanimously to do so.[3]

6         Plaintiffs' application for a Williamson Act contract

7    failed to receive each of those three votes.  (Id. at 10.)  It is

8    undisputed that Supervisor David Kehoe voted "no" and that he

9    announced that he would prefer not to accept any new Williamson

10   Act contracts because it was unclear whether the State of

11   California would end subvention payments to local agencies for

12   lands covered by a Williamson Act contract.  (Id.)  This

13   rationale was consistent with his efforts earlier in the meeting

14

15        [3]  Plaintiffs argue that California law requires the
     abstentions of Hawes and Baugh to be treated as affirmative votes
16   in favor of approving the Williamson Act contract, rather than as
     non-votes.  (Pls.' Mem. at 27-28.)  Although plaintiffs are
17   correct that some decisions have presumed that an abstention is
     treated as an affirmative vote, the Board has adopted rules that
18   require three affirmative votes and treat an abstention as a
     "non-vote."  (See Admin. Policy 1-101 (Defs.' RJN Ex. 5).)  These
19   provisions "alter[ed] the ordinary common law rule" by requiring
     an affirmative vote of three Supervisors, rather than a simple
20   majority of those voting, in order to approve an agenda item.
     County of Sonoma v. Superior Court, 173 Cal. App. 4th 322, 346
21   n.11 (1st Dist. 2009).
          Plaintiffs' reliance on Dry Creek Valley Ass'n v. Bd.
22   Of Supervisors, 67 Cal. App. 3d 839 (1st Dist. 1977), is
     misplaced.  There, the Board of Supervisors had adopted a rule
23   stating that, in the event that one less than the necessary
     number of affirmative votes had been cast, an abstention could be
24   counted as a concurrence.  Id. at 841.  Here, the Board has
     adopted no such rule; rather, Rule 9(a) specifically requires
25   three affirmative votes in order to take action and Rule 9(b)
     provides that an abstention "shall count as a non-vote."  (See
26   Admin. Policy 1-101 (Defs.' RJN Ex. 5).)

27

28

                                  16

1    to place a moratorium on all new Williamson Act contracts because

2    of the possibility that subvention payments would be

3    discontinued.  (Id. at 8.)  Indeed, Richard Simon, the current

4    County Director of Resource Management, avers that the State has

5    reduced subvention payments to "virtually zero," and the County

6    has not approved any new Williamson Act contract since December

7    16, 2008. (Simon Decl. ¶ 13 (Docket No. 133-15).)

8         Plaintiffs do not dispute that the State of California

9    had announced that it was considering ending subvention payments.

10   (Pls.' Resp. to Defs.' SUF ¶ 88.)  Nor do they dispute that

11   County staff had briefed the board about the status of subvention

12   payments and advised the Board that the County could lose as much

13   as $125,000 per year if the state eliminated these payments.

14   (Id. ¶ 89.)  Plaintiffs have therefore not "rebut[ted] the facts

15   underlying defendants' asserted rationale . . . to show that the

16   challenged classification could not reasonably be viewed to

17   further the asserted purpose."  Lazy Y Ranch, Ltd. v. Behrens,

18   546 F.3d 580, 590-91 (9th Cir. 2008).

19        To the extent that the Board singled out plaintiffs for

20   disparate treatment at all, the evidence shows that Kehoe, whose

21   vote was decisive, failed to approve the application for a

22   Williamson Act contract because of its potential fiscal

23   consequences. (See Dec. 16 Minutes at 8, 10.)  The court need not

24   determine whether this concern actually motivated Kehoe or the

25   Board so long as the evidence demonstrates that there was at

26   least a "theoretical connection" between this stated reason for

27   denying the contract and the Board's ultimate decision.

28   Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 463 (1981).

1   Accordingly, to the extent that plaintiffs' § 1983 claim is

2   premised on a violation of the Equal Protection Clause, the court

3   must grant defendants' motion for summary judgment.

4           3.   Due Process Clause

5           The Fourteenth Amendment provides that no state shall

6   deprive any person of life, liberty, or property without due

7   process of law.  U.S. Const. amend. XIV, § 1.  In order to bring

8   a procedural or substantive due process claim, a plaintiff must

9   make a threshold "showing of a liberty or property interest

10  protected by the Constitution." Wedges/Ledges of Cal., Inc. v.

11  City of Phoenix, 24 F.3d 56, 62 (9th Cir. 1994) (citing Bd. of

12  Regents v. Roth, 408 U.S. 564, 577 (1972)).

13          "Property interests are not created by the Constitution

14  but 'by existing rules or understandings that stem from an

15  independent source such as state law . . . .'" Thornton v. City

16  of St. Helens, 425 F.3d 1158, 1164 (9th Cir. 2005) (quoting Roth,

17  408 U.S. at 577).  "In some instances, a person can have a

18  constitutionally protected property interest in a government

19  benefit, such as a license or permit." Gerhart, 637 F.3d at 1019

20  (citing Roth, 408 U.S. at 577).  But a plaintiff who asserts a

21  property interest in a permit or other government benefit cannot

22  simply demonstrate that he had a "unilateral expectation" or an

23  "abstract need or desire" for that benefit; rather, he must

24  demonstrate "a legitimate claim of entitlement to it." Roth, 408

25  U.S. at 577 (emphasis in original).

26          Whether plaintiffs have an "expectation of entitlement

27  sufficient to create a property interest . . . depend[s] largely

28  upon the extent to which the statute contains mandatory language

18

1   that restricts the discretion of the decisionmaker." Allen v.

2   City of Beverly Hills, 911 F.2d 367, 370 (9th Cir. 1990) (quoting

3   Jacobson v. Hannifin, 627 F.2d 177, 180 (9th Cir. 1980)). "[A]n

4   entitlement to a government permit exists when a state law or

5   regulation requires that the permit be issued once certain

6   requirements are satisfied." Gerhart, 637 F.3d at 1019 (citing

7   Groten v. California, 251 F.3d 844, 850 (9th Cir. 2001)). By

8   contrast, if the decision to grant a permit or other benefit is

9   discretionary, plaintiffs have no property interest in that

10   benefit. Doyle v. City of Medford, 606 F.3d 667, 672 (9th Cir.

11   2010) (citing Jacobson, 627 F.3d at 180).

12          Plaintiffs have no property interest in a conditional

13   use permit for a winery at the Home Ranch property. California

14   law provides that "[t]he decision whether to issue a conditional

15   use permit is 'discretionary by definition.'" Kay v. City of

16   Rancho Palos Verdes, 504 F.3d 803, 810 (9th Cir. 2007) (quoting

17   Breakzone Billiards v. City of Torrance, 81 Cal. App. 4th 1205,

18   1224 (2d Dist. 2000)). Plaintiffs' winery permit is therefore

19   "no[t] a federally protected property interest on which to base a

20   . . . due process claim." Clark v. City of Hermosa Beach, 48

21   Cal. App. 4th 1152, 1183 (2d Dist. 1996).

22          Plaintiffs also have no property interest in a

23   Williamson Act contract. The Williamson Act states that "[a]ny

24   city or county may by contract limit the use of agricultural

25   land." Cal. Gov't Code § 51240. A city or county must offer a

26   Williamson Act contract to land located within a designated

27   "agricultural preserve" and cannot offer a contract if the land

28   is not so designated. Cal. Gov't Code §§ 51241-51242. Although

1  these provisions are not discretionary, the Williamson Act

2  nonetheless commits ultimate discretion to cities and counties by

3  providing that "any city or county . . . may establish an

4  agricultural preserve."  Cal. Gov't Code § 51230 (emphasis

5  added).

6       Although plaintiffs concede that the Bear Creek Ranch

7  property is not located within an agricultural preserve, they

8  contend that defendants lacked discretion not to designate the

9  property as an agricultural preserve.  (Pls.' Opp'n 13-14.)  This

10 argument is inconsistent with the statutory text, as the

11 Williamson Act's use of "[t]he word 'may' . . . implies some

12 degree of discretion."  United States v. Rodgers, 461 U.S. 677,

13 706 (1983).  It is also inconsistent with longstanding precedent

14 that emphasizes the Williamson Act's "discretionary language" and

15 characterizes it as "permissive, not mandatory, legislation."

16 Kelsey v. Colwell, 30 Cal. App. 3d 590, 595 (5th Dist. 1973); see

17 also Sierra Club v. City of Hayward, 28 Cal. 3d 840, 851 (1981)

18 (noting that the Williamson Act "empowers local governments to

19 establish 'agricultural preserves'" and that a "locality may

20 offer to owners . . . the opportunity to enter into . . .

21 contracts that restrict the land to open space").

22       Plaintiffs contend that even if the Williamson Act

23 itself does not entitle them to a contract, they are nonetheless

24 entitled to one pursuant to the terms of the County's General

25 Plan.  (Pls.' Opp'n 13-14.)  Section 6.1.4, AG-f of the General

26 Plan states that "[a]ll lands classified as full-time

27 agricultural lands shall be placed in a corresponding

28 agricultural zone district and shall be eligible to enter into a

1  contract, as provided by the Williamson Act . . . ."  (Pls.'

2  Opp'n Ex. X.)  However, it is far from clear that the General

3  Plan could give rise to any protected property interest because

4  "[a] general plan is not a <u>law</u>, but a tentative <u>plan</u>, subject to

5  change." <u>Kawaoka v. City of Arroyo Grande</u>, 796 F. Supp. 1320,

6  1327 (C.D. Cal. 1992) (emphasis in original) (citation omitted);

7  <u>cf.</u> <u>Friends of Lagoon Valley v. City of Vacaville</u>, 154 Cal. App.

8  4th 807, 816 (1st Dist. 2007) ("Because policies in a general

9  plan reflect a range of competing interests, the governmental

10  agency . . . has broad discretion to construe its policies in

11  light of the plan's purposes.")

12       Even if the General Plan could theoretically create a

13  protected property interest, Section AG-f of the General Plan

14  does not show that plaintiffs were entitled to a Williamson Act

15  contract because it applies only to properties that are

16  "classified as full-time agricultural lands." (<u>See</u> Pls.' Opp'n

17  Ex. X.)  The structure of this provision mirrors that of the

18  Williamson Act itself: although the decision to award a contract

19  is not discretionary once the land has been classified, the

20  underlying decision to classify property as full-time

21  agricultural land is a zoning decision that is ultimately

22  discretionary. <u>See, e.g.</u>, <u>Sprint Telephony PCS, L.P. v. County</u>

23  <u>of San Diego</u>, 543 F.3d 571, 580 (9th Cir. 2008) ("A certain level

24  of discretion is involved in evaluating any application for a

25  zoning permit.").  Because the decision to classify plaintiffs'

26  property as full-time agricultural land is discretionary,

27  plaintiffs do not have a "right to a particular zoning

28  designation," i.e., as an agricultural preserve, that is

1  protected by the Due Process Clause.  Tyson v. City of Sunnyvale,
2  920 F. Supp. 1054, 1061 (N.D. Cal. 1996).

3         Plaintiffs also contend that defendants have routinely
4  declined to require a separate determination of "agricultural
5  preserve" status prior to granting a Williamson Act contract.
6  (Pls.' Opp'n 14:16-18.)  Instead, they note, defendants have
7  "treated 'ag[ricultural] preserve' as a status that accompanies
8  the granting of a Williamson Act Contract."  (Id. at 14:13-15.)
9  Even so, defendants are not entitled to similar treatment "merely
10  because a wholly and expressly discretionary state privilege has
11  been granted generously in the past."  Conn. Bd. of Pardons v.
12  Dumschat, 452 U.S. 458, 465 (1981) (emphasis in original); see
13  also, e.g., Cassidy v. Hawaii, 915 F.2d 528, 531 (rejecting the
14  argument that, because a government agency "generally renews
15  permits," a particular individual has "a legal entitlement to
16  have his permit renewed").  Because the decision to grant a
17  Williamson Act contract or to designate land as an agricultural
18  preserve is ultimately discretionary, plaintiffs cannot have a
19  property interest in a Williamson Act contract.  See Doyle, 606
20  F.3d 672.

21         Absent an entitlement to a Williamson Act Contract or a
22  conditional use permit, plaintiffs have not shown that the mere
23  notification of a grading violation deprived them of any liberty
24  or property interest.  Plaintiffs contend that the issuance of
25  the grading violation deprived them of property and liberty
26  interests in their reputation because it "labeled [them] as
27  polluters."  (Pls.' Opp'n at 10:19.)  But this sort of stigma "is
28  not sufficient to satisfy the requirement that a constitutionally

1  protected . . . interest be at stake." WMX Techs., Inc. v.

2  Miller, 197 F.3d 367, 376 (9th Cir. 1999) (en banc).  While

3  plaintiffs assert that the Due Process Clause safeguards "a

4  person's reputation in the community," (Pls.' Opp'n at 10:1-2),

5  the authority they cite stands for exactly the opposite

6  proposition.  See Paul v. Davis, 424 U.S. 693, 701 (1976)

7  (denying that "reputation alone, apart from some more tangible

8  interests such as employment, is either 'liberty' or 'property'

9  by itself sufficient to invoke the procedural protection of the

10  Due Process Clause").[4]

11      In short, plaintiffs have not identified any liberty or

12  property interest of which they were deprived.[5]  Although

13  plaintiffs insist that they were nonetheless entitled to a

14

---

15      [4]   In addition to Paul v. Davis, plaintiffs cite Wisconsin
16  v. Constantineau, 400 U.S. 433 (1971), in support of the
    proposition that the Due Process Clause "extends . . . to claims
17  affecting a [party's] reputation or character." (Pls. Opp'n
    10:9.)  However, Paul v. Davis clarified that this holding in
18  Constantineau applies only insofar as that reputational harm
    deprived the plaintiff of some other liberty or property
19  interest.  424 U.S. at 709-10.  Plaintiffs' contention that bare
    reputational injury is cognizable under the Due Process Clause is
20  therefore incorrect.

21      [5]   Plaintiffs argue that even if they had not suffered any
22  adverse action as a result of the alleged grading violation,
    defendants' failure to record or enforce the grading violation
23  left them in "limbo" and thereby deprived them of due process.
    (Pls.' Mem. at 24-25.)  A lack of enforcement action does not
24  show that plaintiffs were in limbo.  Instead, it shows that
    plaintiffs had not suffered any cognizable injury as a result of
25  the grading violation.  See Guatay Christian Fellowship v. County
    of San Diego, 670 F.3d 957, 984 (9th Cir. 2011) ("[T]he County's
26  [Notice of Violation] and cease-and-desist order did not
    themselves deprive the Church of any interests.  The County would
27  have had to bring an enforcement action in court to actually
    enforce the zoning regulations . . . .").
28

1   hearing to contest the alleged grading violation, their interest

2   in a hearing is not cognizable under the Due Process Clause

3   because it is an "entitlement to nothing but procedure."  Town of

4   Castle Rock v. Gonzales, 545 U.S. 748, 764 (2005).  Accordingly,

5   to the extent that plaintiffs' § 1983 claim is premised on a

6   violation of the Due Process Clause, the court must grant

7   defendants' motion for summary judgment on that claim.

8              4.   First Amendment

9        "The First Amendment forbids government officials from

10  retaliating against individuals for speaking out."  Blair v.

11  Bethel Sch. Dist., 608 F.3d 540, 543 (9th Cir. 2010).  In order

12  to succeed on their First Amendment retaliation claim, plaintiffs

13  must show that: (1) they engaged in constitutionally protected

14  activity; (2) as a result, defendants subjected plaintiffs to

15  adverse action that would chill a person of ordinary firmness

16  from continuing to engage in the protected activity; and (3) a

17  substantial causal relationship existed between plaintiffs'

18  constitutionally protected activity and defendants' adverse

19  action.  Id.

20            a.   Constitutionally Protected Activity

21        Plaintiffs contend that defendants obstructed their

22  applications for both a conditional use permit and a Williamson

23  Act contract in retaliation for plaintiffs' refusal to obtain a

24  grading permit, attempt to appeal the grading violation, and

25  lawsuits against defendants. (Pls.' Opp'n at 19-20.)  This

26  conduct is "protected by [plaintiffs'] right to petition the

27  government" and therefore constitutes constitutionally protected

28  activity.  CarePartners, LLC v. Lashway, 545 F.3d 867, 877 (9th

24

1  Cir. 2008) (citing BE & K Constr. Co. v. NLRB, 536 U.S. 516, 525
2  (2002)).

3          Defendants initially concede that plaintiffs
4  "exercis[ed] their First Amendment right to petition." (Defs.'
5  Mem. at 31:12.)  In their Reply, however, defendants argue that
6  plaintiffs' retaliation claim is unfounded because plaintiffs did
7  not actually appeal the County's grading violation. (Defs.'
8  Reply at 17 (Docket No. 141).)  Plaintiffs offer several letters
9  sent to County and State officials in 2007 and 2008 in which they
10 disputed the County's finding of a grading violation. (See,
11 e.g., Pls.' Mem. Exs. C, E, L.)

12         Whether or not these letters constituted a formal
13 appeal of the grading violation, they are protected under the
14 Petition Clause, see 1 Annals of Cong. 738 (1789) (noting that
15 the First Amendment allows individuals to "communicate their
16 will" by writing directly to lawmakers and government officials),
17 as are the lawsuits that plaintiffs filed.  BE & K Constr. Co.,
18 536 U.S. at 525.  Plaintiffs have therefore shown that they were
19 engaged in constitutionally protected activity.

20              b.   Adverse Action

21         Plaintiffs offer evidence of three instances of adverse
22 action.  First, plaintiffs contend that Mull threatened to
23 withhold a conditional use permit for the Home Ranch winery if
24 they did not obtain a grading permit.  According to Anselmo, Mull
25 attended a meeting on February 1, 2008, about the alleged grading
26 violation at which Anselmo, Hawes, Baugh, and two other officials
27 were also present.  Anselmo avers that during this meeting, "Mull
28 shrugged his shoulders and said 'Well, if you don't pay me for a

                              25

1    grading permit up here I could hold up your CO [conditional use

2    permit] at the winery."  (Anselmo Decl. ¶ 17; Anselmo Dep. at

3    181:12-16.)  Anselmo then avers that after he threatened to sue

4    Mull, Mull responded that "[y]ou can't sue the State of

5    California" because "they have unlimited resources" and "they'll

6    tie you up in court for years."  (Id. at 184:8-19.)  If these

7    claims were true, Mull's conduct would constitute adverse action.

8    See Brodheim v. Cry, 584 F.3d 1262, 1270 (9th Cir. 2009) ("[T]he

9    mere threat of harm can be an adverse action, regardless of

10   whether it is carried out because the threat itself can have a

11   chilling effect.").

12           Second, plaintiffs contend that defendants obstructed

13   their application for a winery permit by requiring plaintiffs to

14   conduct a study to determine whether a plant known as Ahart's

15   Paronychia was present.  (Anselmo Decl. ¶¶ 22-25.)  Plaintiffs

16   received a letter dated January 30, 2008, from Bridget Dirks, an

17   Associate Planner with the County, who indicated that the

18   plaintiffs would need to conduct a "botanical survey" on their

19   property and that this survey "will need to include fish and game

20   approved mitigation measures where appropriate."  (Defs.' RJN Ex.

21   25 at 35.)  Plaintiffs contend that this study delayed their

22   application for a winery permit by several months and cost them

23   $5,000.  (Anselmo Decl. ¶ 26.)

24           Third, plaintiffs contend that the County and the Board

25   withheld approval of the Williamson Act contract in retaliation

26   for plaintiffs' protected conduct.  (See TAC ¶ 55.0.)  Plaintiffs

27   point to a series of letters they received between September 2008

28   and October 2008 from Lio Salazar, an Associate Planner with the

1   County, in which he claimed that plaintiffs could not obtain a

2   Williamson Act contract unless they first abated the grading

3   violation. (Pls. Mem. Exs. H, J.) Although the County Planning

4   Commission ultimately recommended that the Board of Supervisors

5   approve the Williamson Act contract, the Board ultimately did not

6   award plaintiffs the contract. (See Dec. 16 Minutes at 10.)

7        For purposes of this motion, it may be assumed that the

8   denial of either a winery permit or a Williamson Act contract

9   would constitute adverse action even if plaintiffs "[can]not

10  establish a legally protected interest in the permits

11  themselves." Sorrano's Gasco, Inc. v. Morgan, 874 F.2d 1310,

12  1314 (9th Cir. 1989). However, for the reasons discussed below

13  the court finds that plaintiffs have adduced insufficient

14  evidence to show that they suffered such adverse action in

15  retaliation for exercising their speech and petition rights.

16                    c.   Causation

17        Plaintiffs must show "a substantial causal

18  relationship" between their constitutionally protected activity

19  and defendants' adverse action. Blair, 608 F.3d at 543. In

20  order to do so, plaintiffs must "show that the protected conduct

21  was a 'substantial' or 'motivating' factor in the defendant[s']

22  decision." Sorrano's Gasco, 874 F.2d at 1314 (citing Mt. Healthy

23  City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

24        Because "direct evidence of improper motive . . . will

25  only rarely be available," litigants in First Amendment cases

26  typically rely on circumstantial evidence to explain why

27  defendants acted as they did. Mendocino Envtl. Ctr. v. Mendocino

28  County, 192 F.3d 1283, 1302 (9th Cir. 1999). For instance, a

1  plaintiff can survive summary judgment by offering evidence of
2  the "proximity in time between the protected action and the
3  allegedly retaliatory . . . decision," evidence that the
4  defendant "expressed opposition to his speech, either to him or
5  to others," or evidence that the defendant's "proffered
6  explanations for the adverse . . . action were false and
7  pretextual."  Keyser v. Sacramento City Unified Sch. Dist., 265
8  F.3d 741, 751-52 (9th Cir. 2001).  But circumstantial proof of
9  retaliatory motive requires evidence, and "speculation as to . .
10 . improper motive does not rise to the level of evidence
11 sufficient to survive summary judgment."  Karam v. City of
12 Burbank, 352 F.3d 1188, 1194 (9th Cir. 2003) (citing Keyser, 265
13 F.3d at 751).

14                    i.   Mull's Conduct

15          According to plaintiffs, Mull threatened to "hold up"
16 their application for a winery permit at the Home Ranch property
17 if they did not obtain a grading permit for the Bear Creek Ranch
18 property.  (Anselmo Decl. ¶ 17; Anselmo Dep. at 181:12-16.)
19 Plaintiffs argue that Mull then followed through on this threat
20 by ordering the County to require plaintiffs to perform the
21 Ahart's Paronychia study on the Home Ranch property as a
22 condition to obtaining a permit.  (See, e.g., Anselmo Decl. ¶¶
23 21-22.)

24          Plaintiffs have offered no evidence in support of their
25 claim that Mull ordered the plant study.  Mull denies that he was
26 involved in the decision to require the plant study.  (Mull Decl.
27 ¶ 13.)  In fact, Mull claims that he was not even aware of this

28
                              28

1  decision, as "issues regarding CEQA[6] compliance" were made at the

2  staff level and were not brought to his attention unless there

3  was a dispute that required his input.  (Id.)  Defendants also

4  offer a declaration from Richard Simon, the current County

5  Director of Resource Management, who avers that "Mull had no

6  involvement in the study" and was not "even aware of it at that

7  time."  (Simon Decl. ¶ 23.)

8          Simon avers that Bridget Dirks, not Mull, made the

9  decision to require the plant study because the Department of

10  Fish and Game map indicated that Ahart's Paronychia might be

11  present on the Home Ranch property.  (Id.)  Dirks, not Mull,

12  initially informed plaintiffs about the study, (see Defs.' RJN

13  Ex. 25 at 35), and then required plaintiffs to perform the study

14  even after Tom Benson, a botanist and Natural Resources

15  Conservation Service engineer, wrote a letter to the County

16  indicating that plaintiffs' property did not contain hydric soils

17  that could serve as a habitat for Ahart's Paronychia.  (See

18  Anselmo Dep. at 206:20-207:14.)  Plaintiffs have therefore failed

19  to provide evidence sufficient for a fact-finder to conclude that

20  Mull was involved in the decision to impose the plant study, let

21  alone that he ordered the study in retaliation for plaintiffs'

22  exercise of their First Amendment rights.

23          Nor is plaintiffs' claim that Mull threatened to "hold

24  up" the application for a winery permit sufficient to withstand

25  summary judgment.  A defendant's conduct cannot be motivated by a

26  plaintiff's exercise of his First Amendment rights if he is

27  _____

28          [6]   CEQA is an abbreviation for the California
   Environmental Quality Act, Cal. Pub. Res. Code § 21000 et seq.

1   unaware that the plaintiff exercised those rights.  See Allen v.

2   Iranon, 283 F.3d 1070, 1076 (9th Cir. 2002) (citing Keyser, 265

3   F.3d at 750-51).  Therefore, "[t]o survive summary judgment, a

4   plaintiff alleging a First Amendment retaliation claim must

5   produce evidence that the governmental actor had knowledge of his

6   protected speech."  Occhionero v. City of Fresno, 386 Fed. App'x

7   745, 745-46 (9th Cir. 2010) (citing Dietrich v. John Ascuaga's

8   Nugget, 548 F.3d 892, 901 (9th Cir. 2008).

9        Plaintiffs contend that Mull threatened to hold up

10  their application for a winery permit at a meeting on February 1,

11  2008.  (Anselmo Decl. ¶ 17.)  Before that date, plaintiffs'

12  petitions were limited to two letters, dated November 12, 2007,

13  (Pls.' Mem. Ex. C), and January 2, 2008, (id. Ex. E), in which

14  they disputed the County's finding of a grading violation.

15  Neither letter is addressed to Mull.  In fact, Minasian's

16  November 7, 2007 letter is addressed to nine separate recipients,

17  none of whom included Mull or any employee of the County's

18  Department of Natural Resources.  (See id. Ex. C.)

19       Plaintiffs have offered no evidence that Mull was aware

20  that they had exercised their right to petition, let alone that

21  Mull threatened to withhold the winery permit in retaliation for

22  doing so.  See Occhionero, 386 Fed. App'x 745-46; see also

23  Keyser, 265 F.3d at 750-51 (concluding that summary judgment was

24  appropriate where "there [was] no evidence in the record to

25  contradict [defendant's] statement . . . that he was unaware" of

26  the protected speech).  While plaintiffs sent Mull a letter on

27  February 5, 2008, (Pls.' Mem. Ex. G), that letter cannot be the

28  cause of Mull's threat, which they allege occurred four days

30

earlier.  And even if Mull had threatened to withhold a permit
for the Home Ranch property, plaintiffs have offered no evidence
to dispute Mull's claim that he did so because he witnessed
grading on the Bear Creek Ranch property, rather than because of
any retaliatory motive.  (See Mull Decl. ¶ 7.)   Accordingly, to
the extent that plaintiffs' First Amendment claim is based on
Mull's conduct, the court must grant defendants' motion for
summary judgment.

ii.  Delay of the Winery Permit

Plaintiffs also contend that the County retaliated
against them by requiring them to perform the plant study on the
Home Ranch property.  (Anselmo Decl. ¶¶ 21-22; Pls.' Opp'n 22:5.)
Defendants argue that the County mandated this study not because
of plaintiffs' exercise of their First Amendment rights, but
because a routine environmental review of their permit
application disclosed that Ahart's may be present on the Home
Ranch property.  (Defs.' SUF ¶¶ 64-67; Simon Decl. ¶¶ 16-17;
Dirks Decl. ¶ 5.)  Because the State of California lists Ahart's
as a "species of concern," the County concluded that the
California Environmental Quality Act ("CEQA") required it to
mandate the plant study as a condition of obtaining a conditional
use permit.  (Defs.' SUF ¶ 67; Dirks Decl. ¶ 5.)

Plaintiffs have not shown that this rationale was a
pretext for retaliation.  Plaintiffs point to deposition
testimony from their attorney, Bart Fleharty, (Flaherty Dep. at
52:2-3, 52:10-14), and from plant biologist Richard Lis, (Lis
Dep. at 89-91), indicating that the decision to require the plant
study was discretionary.  Even if plaintiffs were correct that

31

1  the plant study was discretionary, that alone is not proof that

2  County officials exercised that discretion in a retaliatory

3  manner.  Cf. Rosenbaum v. City & County of San Francisco, 484

4  F.3d 1142, 1161 (9th Cir. 2006) (holding that city's exercise of

5  discretion in awarding amplified noise permits was not sufficient

6  to show viewpoint discrimination against unsuccessful permit

7  applicants).  And while proof of a "lack of clarity and even-

8  handedness in the policy's implementation" may be sufficient

9  circumstantial evidence of retaliation, Coszalter v. City of

10 Salem, 320 F.3d 968, 978 (9th Cir. 2003), plaintiffs offer no

11 such evidence.

12       Plaintiffs offer deposition testimony indicating that

13 Tom Benson, a botanist and Natural Resources Conservation Service

14 engineer, wrote a letter to the County's resources management

15 division indicating that plaintiffs' property did not contain

16 hydric soils that could serve as a habitat for Ahart's

17 Paronychia.  (Anselmo Dep. at 206:20-25.)  Anselmo then testified

18 that after receiving Benson's letter, the County nonetheless

19 required plaintiffs to conduct the study, resulting in further

20 costs and delay.  (Id. at 207:2-14.)

21       True as this may be, it is insufficient evidence from

22 which to infer retaliatory motive.  Defendants contend – and

23 plaintiffs admit – that Dirks contacted Dr. Lis, who then worked

24 for the Department of Fish and Game, to ask whether Benson's

25 letter was sufficient to satisfy the requirement for a plant

26 study.  (Pls.' Resp. to Defs.' SUF, ¶ 71; Dirks Decl. ¶ 6.)  Lis

27 then informed Dirks that Benson's letter was not sufficient

28 because he was not a licensed botanist and because Benson's

1   report did not seem to reflect familiarity with where Ahart's

2   "really grew."  (Lis Dep. at 96:3-22.)

3        Plaintiffs offer no evidence that this reason was a

4   pretext for retaliation.  And while plaintiffs characterize the

5   plant study as "burdensome and atypical," (Pls.' Opp'n at 22:5),

6   they provide no evidence showing that the County's environmental

7   compliance policy was not applied in an "even-handed" way to

8   other permit applicants.  Coszalter, 320 F.3d at 978.

9        Plaintiffs offer no other proof of a causal connection

10  between their dispute of the grading violation and the County's

11  decision to require the plant study.  Although the County

12  required the plant study only three months after plaintiffs first

13  disputed the grading violation, "mere temporal proximity" is

14  ordinarily not evidence of causation.  Clark Cnty. Sch. Dist. v.

15  Breeden, 532 U.S. 268, 273 (2001).  Rather, temporal proximity is

16  relevant only as part of the "totality of the facts."  Coszalter,

17  320 F.3d at 978; see also Coszalter, 320 F.3d at 978 ("[T]here is

18  no set time within which acts necessarily support an inference of

19  retaliation.").  Absent other evidence of a causal connection

20  between the plant study and plaintiffs' protected activity, a

21  three-month gap in time does not permit a factfinder to infer

22  retaliatory motive.

23        As explained above, there is also no evidence that Mull

24  ordered the plant study, or that anyone involved in ordering the

25  plant study was aware of plaintiffs' exercise of their First

26  Amendment rights.  Accordingly, to the extent that plaintiffs'

27  First Amendment claim is based on the decision to require a study

28  to detect whether Ahart's Paronychia was present, the court must

1    grant defendants' motion for summary judgment on that claim.

2                  iii. <u>Denial of the Williamson Act Contract</u>

3              Finally, plaintiffs contend that Hawes and Baugh

4    recused themselves in order to deny plaintiffs two of the three

5    votes needed to obtain a Williamson Act contract.  Although Hawes

6    and Baugh contend that they recused themselves because of a

7    conflict of interest, plaintiffs have argued since filing their

8    Third Amended Complaint that this "was a bad faith pretext to

9    bring about what they believed would constitute a denial of

10   Plaintiffs' application."  (TAC ¶ 55.0.)

11             Plaintiffs do not dispute that they sued Hawes and

12   Baugh on October 2, 2008.  (See Defs.' RJN Ex. 24.)  As a result,

13   Hawes and Baugh rightly recused themselves from voting on

14   plaintiffs' application for a Williamson Act contract.[7]  (Baugh

15   Decl. ¶ 12; Hawes Decl. ¶ 15.)  Had they not done so, Hawes and

16   Baugh not only would have exposed themselves to charges of bias

17   and partiality, but would have exposed themselves to potential

18   liability had they voted to deny plaintiffs' application.  <u>See</u>

19   <u>Stivers v. Pierce</u>, 71 F.3d 732, 750 (9th Cir. 1995) (holding that

20   a licensing board member was liable for voting against

21   plaintiff's license application because his "opposition to

22   [plaintiff's] application was motivated by his own personal

23   bias").

24             Plaintiffs have not shown that this reason was a "bad

25   _____

26        [7]    Although it does not use mandatory language, Rule 9(b)
     of the Board's Administrative Manual specifically contemplates
27   that Supervisors will disqualify themselves in the event of a
     conflict of interest.  (See Admin. Policy 1-101 (Defs.' RJN Ex.
28   5).)

1    faith pretext" for retaliation.  (See TAC ¶ 55.0.)  Plaintiffs

2    offer evidence that Hawes attempted to persuade them to purchase

3    mitigation credits to resolve the grading violation, (Anselmo

4    Decl. ¶¶ 16.0-16.1), and that Baugh informed them that they could

5    resolve the grading violation by obtaining an "administrative

6    permit" for a hydroelectric generator.  (Id. ¶¶ 23-24.)  Even if

7    these claims were correct, plaintiffs' evidence does not show

8    that Hawes and Baugh recused themselves because plaintiffs

9    refused these overtures, let alone that Hawes and Baugh recused

10   themselves in retaliation for exercising their right to petition.

11          Finally, Anselmo avers that Hawes and Baugh "stood up

12   with a nod to each other" just before the vote on the Williamson

13   Act contract was set to occur.  (Anselmo Dep. at 215:20-21.)

14   This is not evidence of retaliatory motive, of an agreement

15   between Hawes and Baugh, or of anything at all.  Plaintiffs'

16   belief that Hawes and Baugh "acted from an unlawful motive,

17   without evidence supporting that belief, is no more than

18   speculation or unfounded accusation about whether the

19   defendant[s] really did act from an unlawful motive."  Carmen v.

20   S.F. Unified Sch. Dist., 237 F.3d 1026, 1028 (9th Cir. 2001).  To

21   the extent that plaintiffs' First Amendment claim is premised on

22   Hawes' and Baugh's conduct, the court must grant defendants'

23   motion for summary judgment.

24          Although plaintiffs have shown that they engaged in

25   constitutionally protected activity and that they suffered

26   adverse action, they have failed to provide the evidence crucial

27   to establishing a causal link between the two.  Plaintiffs'

28   allegations of retaliation are "entirely speculative," and

1    "[t]here is no specific, admissible evidence in the voluminous

2    record that the plaintiffs can cite to support their claims that

3    any of the defendants sought to enforce the law on account of a

4    retaliatory animus . . . ."  CarePartners LLC v. Lashway, 428

5    Fed. App'x 734, 735 (9th Cir. 2011).  Accordingly, to the extent

6    that plaintiffs' § 1983 claim is premised on a violation of the

7    First Amendment, the court must grant defendants' motion for

8    summary judgment.[8]

9         B.   Write of Mandate

10   _____

11        [8]   Although the court does not reach this issue, it is
     likely that Hawes, Baugh, and Mull would be entitled to qualified
12   immunity even if plaintiffs' evidence were sufficient to survive
     summary judgment on their First Amendment claim.  In actions
13   under § 1983, "qualified immunity protects government officials
     'from liability for civil damages insofar as their conduct does
14   not violate clearly established statutory or constitutional
     rights of which a reasonable person should have known."  Pearson
15   v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v.
     Fitzgerald, 457 U.S. 800, 818 (1982)).
16        The "clearly established" inquiry "assesses the
     objective reasonableness of the official's conduct in light of
17   the decisional law at the time."  Moss v. U.S. Secret Serv., 675
     F.3d 1213, 1222 (9th Cir. 2012).  Whether or not plaintiffs could
18   identify a clearly established right that defendants purportedly
     violated, it is unlikely that the court would conclude that any
19   of the conduct at issue here – including Mull's statement that a
     permit may be denied because of outstanding grading violation,
20   the imposition of the plant study, or the denial of the
     Williamson Act contract — is objectively unreasonable.  See id.;
21   see also Malley v. Briggs, 475 U.S. 335, 341 (1986) (noting that
     qualified immunity "provides ample protection to all but the
22   plainly incompetent or those who knowingly violate the law.").
          Even if plaintiffs had evidence sufficient to show
23   retaliatory animus, which they do not, that evidence would not be
     "sufficient to defeat immunity if the defendant[s] acted in an
24   objectively reasonable manner."  Id.; see also Crawford-El v.
     Britton, 523 U.S. 574, 588 (1998) ("[A] defense of qualified
25   immunity may not be rebutted by evidence that the defendant[s']
     conduct was malicious or improperly motivated.  Evidence
26   concerning the defendant[s'] subjective intent is simply
     irrelevant to that defense.").

27

28

1        Under California law, "it is well settled that although

2   a court may issue a writ of mandate requiring legislative or

3   executive action to conform to the law, it may not substitute its

4   discretion for that of legislative or executive bodies in matters

5   committed to the discretion of those bodies." Common Cause v.

6   Bd. of Supervisors, 49 Cal. 3d 432, 445 (1989). "[A]lthough a

7   court may order a local legislative body to perform a

8   nondiscretionary ministerial act, it may not control a local

9   board's discretion." Id. (citing Glendale City Emps. Ass'n, Inc.

10  v. City of Glendale, 15 Cal. 3d 328, 324 (1975)).

11        As explained above, see infra Part IV.A.3, the decision

12  to award or deny a Williamson Act contract or to designate a

13  parcel of land as an agricultural preserve is discretionary. See

14  Kelsey, 30 Cal. App. 3d at 595. Accordingly, the court must

15  grant defendants' motion for summary judgment with respect to

16  plaintiffs' claim for a writ of mandate to compel the award of a

17  Williamson Act contract.

18        IT IS THEREFORE ORDERED that plaintiffs' motion for

19  summary judgment be, and the same hereby is, DENIED, and that

20  defendants' motion for summary judgment be, and the same hereby

21  is, GRANTED.

22  Dated:  October 28, 2013

23

WILLIAM B. SHUBB
24  UNITED STATES DISTRICT JUDGE

25

26

27

28

37